STATE OF NORTH CAROLINA v. KIM HESTER BATTLE, DEFENDANT-APPELLANT

No. COA09-201

(Filed 16 February 2010)

## 1. Search and Seizure— probable cause—motion to suppress

Defendant's argument that the trial court erred in denying her motion to suppress evidence discovered as the result of a strip search because the officer lacked probable cause to conduct the search was overruled. Defendant's argument contained multiple violations of the rules of appellate procedure and was subject to dismissal. Furthermore, even if defendant's argument had been that the search exceeded the scope of the stop, and that argument was properly before the Court, that fact would not serve as a basis upon which to find error with the trial court's order, as the trial court based its order on its determination that probable cause existed.

## 2. Search and Seizure— strip search—Fourth Amendment violation—motion to suppress

The trial court erred in denying defendant's motion to suppress evidence found as a result of a road-side strip search, during which a police officer unbuttoned, unzipped, and lowered defendant's pants, pulled the waistband of defendant's underpants out, and reached into her underpants to retrieve contraband. The search violated defendant's Fourth Amendment rights as it was an unnecessary intrusion into defendant's privacy and was unreasonable under the totality of the circumstances. There was nothing in the trial court's order stating that there were exigent circumstances justifying the search.

Judge STEELMAN concurs with a separate opinion.

Appeal by Defendant from judgment entered 7 October 2008 by Judge Paul C. Ridgeway in Superior Court, Granville County. Heard in the Court of Appeals 2 September 2009.

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell, for the State.*

*Sofie W. Hosford for Defendant.*

STATE v. BATTLE

[202 N.C. App. 376 (2010)]

McGEE, Judge.

Kim Hester Battle (Defendant) was indicted on 1 October 2007 for possession of heroin and drug paraphernalia. Defendant filed a motion to suppress on 6 October 2008. This motion was heard on 7-8 October 2008, and following the presentation of the evidence, the trial court denied Defendant's motion. Following the denial of Defendant's motion to suppress, Defendant entered into a plea agreement with the State whereupon Defendant admitted guilt to both charges. Defendant was given a sentence of five to six months' imprisonment, which was suspended, and Defendant was placed on supervised probation for twenty-four months. Defendant preserved her right to appeal the denial of her motion to suppress pursuant to the plea agreement. Defendant appeals.

The State's evidence at the suppression hearing tended to show the following: Granville County Sheriff's Department detectives Kevin Dickerson and Christa Lynn Curl (the detectives), members of a special drug unit, received a tip from a confidential informant concerning drug activity on 31 August 2007. Detective Curl was Detective Dickerson's supervisor at that time. Detective Dickerson testified that the informant had proven reliable in the past, and the informant's tips had led to "thirty plus" arrests. The informant had told Detective Dickerson that "Glen Murfree [(Murfree)] would be picking up Antonio Evans [(Evans)] and [Murfree's] girlfriend, [Defendant], would also be in the vehicle." The informant further stated that Murfree would be driving his father's green Oldsmobile, and that they would be heading to Durham to purchase an ounce to an ounce and a half of cocaine.[1] The informant indicated that following the trip to Durham, the threesome would return by "coming up 85. They would get off at the Linden Avenue exit and come into town on Linden Avenue." Detectives Curl and Dickerson, traveling in a black Chevrolet Tahoe (the Tahoe), drove to a Shell service station where they set up surveillance of the Linden Avenue exit for Interstate 85 North. Detectives Curl and Dickerson discussed how they would handle the situation if they were to spot the subject vehicle. The detectives had recently received an SBI report indicating that a substance seized from Murfree on a prior occasion had tested positive for cocaine. Based upon this new information, the detectives decided to "place

---

1. Detective Dickerson initially testified that the informant had told him Murfree would be purchasing heroin, but when shown the police report he had filed which indicated the informant had told Detective Dickerson Murfree would be purchasing cocaine, Detective Dickerson stated, "I stand corrected."

[Murfree] under arrest immediately." Detective Curl testified that her "intent was to stop the vehicle and if we found—located drugs in the car, to make an arrest." The detectives did in fact spot a green Oldsmobile, "driven by [Murfree]. [Evans was] seated in the back seat. [Defendant was] seated in the front seat." The Oldsmobile was determined to be registered to Murfree's father. The detectives followed the Oldsmobile for a distance, then activated the blue light and initiated a stop. The detectives approached the Oldsmobile, and Detective Dickerson asked Murfree for his license and registration, which Murfree provided.

Detective Dickerson called in the information from the Tahoe, and also called for "an additional unit" for backup. When asked why he had called for backup, Detective Dickerson testified: "Because I knew we were about to arrest [Murfree] and search the . . . vehicle[.]" Two additional officers arrived at the scene in response to Detective Dickerson's call. Murfree, upon being asked, told Detective Dickerson that there were no drugs in the Oldsmobile. Detective Dickerson requested that Murfree exit the vehicle, and Murfree complied. Detective Dickerson "took possession of [Murfree] and Detective Curl noticed some green, small baggies [in the driver's side door of the Oldsmobile.]" Both detectives testified that there were "over fifty total" small Ziplock bags contained within one larger Ziplock bag. Both detectives testified that, based on their training and experience, the bags constituted "drug paraphernalia." Detective Dickerson then placed Murfree in handcuffs and escorted him to the Tahoe, opened both the front and rear passenger doors, placed Murfree between the doors, informed him that he was under arrest for the prior cocaine charge, and searched Murfree. No contraband was recovered from that search. Evans was also searched and, because no contraband was found on him, he was released.

Detective Curl, who is female, asked Defendant if Defendant was carrying any drugs, to which Defendant responded that she was not. Detective Curl then told Defendant that she "was [going to] check [Defendant] first for weapons and then . . . was [going to] search her." Detective Curl then escorted Defendant to the Tahoe, and conducted a search of Defendant. Defendant was placed between the open doors of the Tahoe, and also between the body of the Tahoe and Detective Curl. Detective Curl testified she placed Defendant in this location for the search

> [b]ecause I—you don't want to be intrusive. I didn't want to show the public what we were doing, for one thing. And it—I mean, a

privacy issue. I mean, you are going to search a lady and you're going to try to be as less intrusive as you can. You don't want to show everything.

Detective Curl instructed Defendant to pull the bottom of her bra away from her body and shake the bra. Defendant was not required to remove her shirt or lift it up to do this. Twice Detective Curl testified that nothing fell from Defendant's bra area: "Q. [Y]ou checked and there was nothing in the bra, right? A. Right." Defendant testified that a package of rolling papers fell out from her bra at this time. Detective Curl then conducted a pat-down search of Defendant, and placed her hands inside Defendant's pockets. Detective Curl felt nothing that suggested Defendant was carrying a weapon or contraband pursuant to this search. Detective Curl then testified that

> I went down to start checking her pants. And as I reached down to the front of her pants, [Defendant] reached [as if Defendant was attempting to reach inside her pants]. [Defendant] reached down to her pants. I said, no, stop. And I told her . . . let me do this. And again, I reached, trying to—she had—the pants she had on, they had a zipper on them and I reached to grab again, she reached down again. I told her for a second time, no, let me do this. I said, . . . Detective Dickerson, step back here, because he had the Taser in his hand. . . . He stepped back to where we— where I was searching her. He put his back against mine, facing the opposite direction of [Defendant].

Detective Curl testified that she asked Detective Dickerson to stand nearby with the Taser in case Defendant "reached again and we had to struggle[.]" Detective Dickerson testified that he readied his Taser "[n]ot knowing if [Defendant] was going to actively resist and if she had a weapon or anything of that nature on her person. At this time we didn't know that she had any drugs on her or not. It could have been a weapon." Detective Curl testified that she

> reached the third time. I pulled her pants open in front. They were unzipped. I pulled them open. Pulled her underwear back and between her skin and the underwear was a five dollar bill and a crack pipe. I reached in and retrieved it. I opened the five dollar bill up. There was a plastic baggie with tan powder inside. I placed her under arrest for possession of heroin.

Detective Curl testified that Defendant's pants were unzipped and open, but not pulled down, and that she pulled Defendant's under-

wear out away from Defendant's body from the front and from behind in order to see inside, but that Defendant's underwear was never "dropped." Detective Curl "could see the top of [Defendant's]—just— her hairline [pubic hair,]" and also Defendant's buttocks. Detective Curl testified that in her experience drugs are often hidden in a suspect's underwear, and that "guys would give [drugs] to the girls because ninety-five percent of the time a female officer is not there and the ladies are not going to get searched."

The search was conducted between 5:00 and 5:45 p.m., and it was daylight. At no time did either detective notice anything in the vehicle or on the occupants that resembled a weapon, nor were any drugs found prior to the heroin retrieved from Defendant's underwear. Defendant, Murfree and Evans were compliant and non-threatening throughout the entire stop and arrests, other than when Defendant reached towards her pants as Detective Curl was attempting to search inside Defendant's underwear. Additional facts will be discussed in the body of the opinion.

I.

Defendant makes two arguments on appeal under the umbrella heading that the trial court erred by dismissing her motion to suppress. Defendant contends that her rights pursuant to the Constitution of the United States and the Constitution of the State of North Carolina were violated by what amounted to a strip search of Defendant conducted by Detective Curl in public. We address these two arguments separately below.

> The scope of appellate review of a ruling upon a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." An appellate court accords great deference to the trial court's ruling on a motion to suppress because the trial court is entrusted with the duty to hear testimony (thereby observing the demeanor of the witnesses) and to weigh and resolve any conflicts in the evidence. . . . "Where there is no material conflict in the evidence, findings and conclusions are not necessary even though the better practice is to find facts."

State v. Johnston, 115 N.C. App. 711, 713-14, 446 S.E.2d 135, 137 (1994) (internal citations omitted). "[T]he trial court's conclusions of

law must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997). " '[P]er se rules are inappropriate in the Fourth Amendment context,' as 'the proper inquiry necessitates a consideration of "all the circumstances surrounding the encounter." ') (quoting *Florida v. Bostick*, 501 U.S. 429, 115 L. Ed. 2d 389, 402 (1991))" *State v. Stone*, 362 N.C. 50, 56-57, 653 S.E.2d 414, 419 (2007). The State has the burden of proving that all evidence was lawfully obtained. *State v. Gibson*, 32 N.C. App. 584, 586, 233 S.E.2d 84, 86 (1977). "[A]lthough the standard is the same, more evidence may be required when the officer is acting without a warrant." *State v. Nixon*, 160 N.C. App. 31, 34, 584 S.E.2d 820, 823 (2003); *see also State v. Harvey*, 281 N.C. 1, 7, 187 S.E.2d 706, 710 (1972).

We first note that neither the United States Supreme Court nor the appellate courts of this State have clearly defined the term "strip search." However, the United States Supreme Court has stated:

> The exact label for this final step in the intrusion is not important, *though strip search is a fair way to speak of it.* [Two female school officials] directed [the female student] to remove her clothes down to her underwear, and then "pull out" her bra and the elastic band on her underpants. Although [the two female school officials] stated that they did not see anything when [the female student] followed their instructions, we would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen. The very fact of [the female student's] pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.

*Safford Unified Sch. Dist. #1 v. Redding*, —— U.S. ——, ——, 174 L. Ed. 2d 354, 364 (2009) (internal citations omitted) (emphasis added). We further note that the attorneys for both the State and Defendant referred to the search of Defendant as a "strip search" at the suppression hearing, and we will refer to the contested search as a "strip search."

## II.

**[1]** In Defendant's first argument, she contends that "even if the informant's tip provided reasonable suspicion for the stop of the car . . . [Detective Curl] lacked probable cause to conduct what amounted to a strip search of [Defendant.]"

However, Defendant's first argument rests entirely upon the assumption that any search of Defendant was permissible solely upon the basis of reasonable suspicion, as defined and limited by *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889 (1968), and United States Supreme Court and North Carolina appellate court opinions following *Terry*. Defendant argues that the search of Defendant went beyond the scope allowed pursuant to a *Terry* stop. Defendant's first assignment of error states in relevant part that the trial court erred "when it denied . . . [D]efendant's motion to suppress evidence on the grounds that law enforcement did not have probable cause to conduct a 'strip search' of . . . [D]efendant in a public place."

First, Defendant's argument does not conform to the relevant assignment of error, which states that Defendant's motion to suppress was based upon a lack of probable cause, not upon a search that exceeded the scope permitted based upon a reasonable suspicion. Second, the trial court's order dismissing Defendant's motion to suppress was based on the trial court's conclusion that probable cause existed for the search of Defendant, and does not mention the presence or absence of any reasonable suspicion. Third, Defendant makes no argument in this part of her brief that probable cause was lacking for the search of Defendant, only that the search was outside the scope permitted pursuant to *Terry* and its progeny. As Defendant makes no such argument, Defendant also cites no authority in support of a contention that probable cause was lacking in this case. Defendant's argument violates multiple rules of appellate procedure, and is subject to dismissal. *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 657 S.E.2d 361 (2008); *Viar v. N.C. DOT*, 359 N.C. 400, 401, 610 S.E.2d 360, 360 (2005). Fourth, assuming *arguendo* the search of Defendant did fall outside the scope of what is permitted during a *Terry* stop—an issue not properly before this Court on this appeal—that fact would not serve as a basis upon which to find error with the trial court's order, as the trial court bases its order on its determination that probable cause existed on the facts before it. *Johnston*, 115 N.C. App. at 713-14, 446 S.E.2d at 137. This argument is without merit.

## III.

[2] In Defendant's second argument, she contends that the contested search violated her Fourth Amendment rights because it "constituted an unnecessary intrusion into [Defendant's] privacy and was unreasonable under the totality of the circumstances." We agree.

> The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable. Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.

*Florida v. Jimeno*, 500 U.S. 248, 250-51, 114 L. Ed. 2d 297, 302 (1991). The scope of a search is generally defined by its expressed object. *Id.* at 251, 114 L. Ed. 2d 297, 303.

> What is reasonable, of course, "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Thus, the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 103 L. Ed. 2d 639, 661 (1989) (internal citations omitted).

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 60 L. Ed. 2d 447, 481 (1979).

> The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

*Schmerber v. Cal.*, 384 U.S. 757, 769-70, 16 L. Ed. 2d 908, 919 (1966).

A. *Scope of the Particular Intrusion*

Our Supreme Court stated in *Stone* that " 'deeply imbedded in our culture . . . is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their "private" parts observed or touched by others.' " *Stone*, 362 N.C. at 55, 653 S.E.2d at 418 (quoting *Justice v. City of Peachtree*, 961 F.2d 188, 191 (11th Cir. 1992)).

> The United States Supreme Court has said that the "constant element in assessing Fourth Amendment reasonableness in consent cases is the great significance given to widely shared social expectations." *Georgia v. Randolph*, 547 U.S. 103, 111, 164 L. Ed. 2d 208, 220 (2006). The search of . . . intimate areas would surely violate our widely shared social expectation; these areas are referred to as "private parts" for obvious reasons.

*Id.* In *Starks v. City of Minneapolis*, 6 F.Supp.2d 1084 (D.Minn., 1998), the United States District Court of Minnesota commented on the rarity of this kind of invasive roadside search.

> As one might expect, there is very little case law considering the use of on-street strip searches. The Court considers the paucity of case law as reflective of the natural assumption that these things simply do not occur. By way of example, the United States Supreme Court, when considering the governmental interest underlying a stationhouse search of an arrestee, stated in *Illinois v. Lafayette*, 462 U.S. 640, 645, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983) that, "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street." Other courts have explicitly recognized that a strip search on a public street is not justified. "Probable cause that an arrestee is hiding something on his body does not justify conducting on a public street a strip search or some search akin to one." *United States v. Bazy*, Nos. 94-40018-01-SAC, 94-40018-02-SAC, 1994 WL 539300, at 8 (D.Kan. Aug.29, 1994).
>
> Similarly, the Fourth Circuit upheld a strip search which occurred in a police van, finding it was not unconstitutional because "the search did not occur on the street subject to public viewing." *United States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir.1997). Under very unusual circumstances, the D.C. Circuit upheld a strip search on a public street when officers had deduced that the defendant was trying to push drugs into his buttocks. But

STATE v. BATTLE

[202 N.C. App. 376 (2010)]

even under such circumstances, that circuit stated, "We wish to make it clear, however, that such public intrusions should not be the norm. Ordinarily, when police wish to search the private areas of an arrestee's person incident to arrest, they should first remove the arrestee to a private location—i.e., a private room in the stationhouse." *United States v. Murray*, 22 F.3d 1185 (D.C. Cir.1994).

*Starks*, 6 F.Supp.2d at 1088:

"A strip search is an invasion of personal rights of the first magnitude." *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993). The Seventh Circuit described strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary Beth G. v. City of Chicago*, 723 F.2d at 1272; *see also Chapman*, 989 F.2d at 396. No matter how professional or courteous the manner used in conducting a strip search, it remains an embarrassing and humiliating experience. *Boren v. Deland*, 958 F.2d 987, 988 n. 1 (10th Cir. 1992). Strip searches, thus, are not a matter of course for searches incident either to arrest or detention.

*United States v. Bazy*, 1994 U.S. Dist. LEXIS 14165, 13-14 (D. Kan. Aug. 29, 1994), *aff'd*, 82 F.3d 427, (10th Cir., 1996); *see also Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1446 (9th Cir. 1991) ("[T]he 'full search [incident to arrest]' authorized by [the United States Supreme Court decision in] *Robinson* was limited to a pat-down and an examination of the arrestee's pockets, and did not extend to 'a strip search or bodily intrusion.' ").

In the present case, the trial court made the following relevant findings of fact:

21. Detective Curl . . . unbuttoned [D]efendant's pants . . ., unzipped the zipper and lowered the pants . . . so that the top of the pants rested on the lower part of [D]efendant's hip. Detective Curl pulled the elastic waistband in the front of [D]efendant's underpants and observed a crumpled five dollar bill and a metal crack pipe. These items were inside [D]efendant's underpants at approximately the level of [D]efendant's pubic hairline.

22. Detective Curl reached into [D]efendant's underpants and removed these items. . . .

23. Detective Curl also pulled the rear elastic band of . . . [D]e-fendant's underpants and visually examined [D]efendant's but-tocks area[.]

. . . .

25. All of this activity took place during daylight hours.

We hold these findings demonstrate that the scope of the intrusion relative to Defendant's person was great, as any reasonable person would have found it to be a humiliating experience far beyond that incident to an arrest and search of Defendant's outer garments alone. *Redding,* —— U.S. at ——, 174 L. Ed. 2d at 364 ("The very fact of [the female student's] pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both sub-jective and reasonable societal expectations of personal privacy sup-port the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.").

Whether anyone other than Detective Curl actually saw Defend-ant's private parts during the search is irrelevant to the Fourth Amendment analysis in this regard.

Although [the two female school officials] stated that they did not see anything when [the female student] followed their instruc-tions [by pulling the top of her underwear away from her body], we would not define strip search and its Fourth Amendment con-sequences in a way that would guarantee litigation about who was looking and how much was seen.

*Id.*

B. *The Manner in Which the Search was Conducted*

In its findings of fact, the trial court stated the following relevant facts in addition to those stated above:

15. Detective Curl, who is female, then escorted [D]efendant to the passenger side of the police vehicle. The police vehicle was a Chevy Tahoe sports utility vehicle with darkly tinted win-dows. Detective Curl had [D]efendant stand between the open passenger side front and rear doors, and Detective Curl posi-tioned herself so that [D]efendant was between the detective and the vehicle.

. . . .

24. At no time did Detective Curl lower [D]efendant's underpants.

25. . . . Slightly to the front of the vehicle was a nursing home. Across the street on the driver's side of the police vehicle were several homes with occupants on the porch. During the course of the activity described herein five or six other vehicles passed on the road. There is no evidence that any person, other than Detective Curl, viewed the search or would have been able to view the search of [D]efendant because of the way the police vehicle was positioned with the doors open on either side and with Detective Curl's body shielding any possible view from the fourth side.

We further find that there was uncontested evidence that we factor into our analysis. *See Johnston,* 115 N.C. App. at 713-14, 446 S.E.2d at 137. Detective Curl was not wearing gloves at the time of the search, and Detective Curl reached into Defendant's underpants with her bare hand. Two additional officers responded that day, and at least one of these, a male, was at the scene at the time of the search. Further, Detective Dickerson stood in close proximity to Defendant during the search with a Taser at the ready.

We find that the trial court's statement that there was "no evidence that any person viewed the search or would have been able to view the search" is not supported by the record evidence. Defendant testified at the hearing, and her testimony was that pedestrians and passing cars could see her while the search was being conducted. Because it is the province of the trial court to judge the credibility of the witnesses and the testimony, we will assume the trial court's finding to mean that it determined, from the evidence presented, that Detective Curl conducted the search in a manner which shielded Defendant's mid-section from public view. We find that Detective Curl made honest attempts to protect Defendant's privacy during the search. However, we again reiterate that whether or not others were actually able to view Defendant's private parts does not automatically render a roadside strip search reasonable under the Fourth Amendment. *Redding,* —— U.S. at ——, 174 L. Ed. 2d at 364.

## C. *The Justification for Initiating the Search*

Defendant has not preserved on appeal her argument that there was no probable cause to arrest her. Therefore, for the purposes of this appeal, we must assume that Detective Curl was justified in conducting a search of Defendant incident to arrest. A valid search inci-

dent to arrest, however, will not normally permit a law enforcement officer to conduct a roadside strip search. *See Mary Beth G. v. Chicago*, 723 F.2d 1263, 1270-71 (7th Cir. 1983) ("[C]ustodial searches incident to arrest still must be reasonable ones: 'Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct "must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." ' 415 U.S. at 808 n.9 (quoting *Terry v. Ohio*, 392 U.S. at 20)"); *Bazy*, 1994 WL 539300 at 26 ("Probable cause that an arrestee is hiding something on his body does not justify conducting on a public street a strip search or some search akin to one. There must be other circumstances present which prevent an officer from waiting until the arrestee can be moved to a private location, like the station house."). In order for a roadside strip search to pass constitutional muster, there must be both probable cause and exigent circumstances that show some significant government or public interest would be endangered were the police to wait until they could conduct the search in a more discreet location—usually at a private location within a police facility. " 'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and . . . the belief of guilt must be particularized *with respect to the person to be searched* or seized[.]" *Maryland v. Pringle*, 540 U.S. 366, 371, 157 L. Ed. 2d 769, 775 (2003) (citations omitted) (emphasis added).

> [T]he factors justifying a search of the person and personal effects of an arrestee upon reaching a police station but prior to being placed in confinement are somewhat different from the factors justifying an immediate search at the time and place of arrest.
>
> The governmental interests underlying a station-house search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest. Consequently, the scope of a station-house search will often vary from that made at the time of arrest. Police conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and privately—be performed at the station. For example, the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him, although that step would be rare.

STATE v. BATTLE

[202 N.C. App. 376 (2010)]

*Illinois v. Lafayette*, 462 U.S. 640, 645, 77 L. Ed. 2d 65, 70-71 (1983); *see also Welsh v. Wis.*, 466 U.S. 740, 751, 80 L. Ed. 2d 732, 744 (1984) (" 'When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.' ") (citation omitted); *Id.* at 752, 80 L. Ed. 2d at 745 (" 'The [exigent-circumstances] exception is narrowly drawn to cover cases of real and not contrived emergencies.' ") (citation omitted).

In addition to the findings of fact cited above, the trial court made these additional relevant findings:

1. On August 31, 2007, [the detectives] received a telephone call from a confidential informant advising Detective Dickerson that later that afternoon three individuals identified as Glenn Murfree, Antonio Evans, and [Defendant] would be going to Durham to make a purchase of one to one point five ounces of cocaine and returning to Oxford via Interstate I-85. The confidential informant told Detective Dickerson that these three individuals would be driving a green Oldsmobile belonging to Mr. Murfree's father and that they would be exiting I-85 at the Linden Road ramp.

The trial court also found the following: The detectives were experienced officers with special drug training, and that Detective Dickerson was familiar with the confidential informant, who had provided reliable information on numerous occasions in the past that had led to at least thirty arrests. The detectives stationed themselves in a position to observe the relevant exit ramp from I-85 onto Linden Road, and observed a green Oldsmobile proceed down that ramp and pull into a nearby gas station and convenience store. The Oldsmobile was occupied by Murfree, Evans and Defendant. After the Oldsmobile left the gas station parking lot, the detectives followed it and eventually activated their blue lights and stopped the vehicle. The detectives approached the Oldsmobile and requested Murfree's driver's license and registration, which Murfree provided. Detective Curl asked Murfree to exit the Oldsmobile, and when Murfree complied, Detective Curl noticed "at least fifty small plastic baggies in the driver door storage compartment." Detective Curl "recognized the plastic baggies as those used by drug dealers for packaging heroin or crack cocaine for individual sale." Detective Dickerson searched Murfree, but found no weapons or other contraband. Upon asking Defendant to pull out her bra and shake it, a package of cigarette

rolling papers fell to the ground from inside Defendant's shirt.[2] Detective Curl then searched Defendant. When Detective Curl "reached to unbutton [D]efendant's pants . . . [D]efendant also reached down towards her pants. After informing [D]efendant to stop reaching, [D]efendant attempted twice more to reach towards her pants." Detective Curl "perceived the repeated attempts by [D]efendant to reach into her pants to be an indication that contraband was likely secreted inside her pants." Detective Curl believed from her training and experience that people hiding drugs often hid them in "their pants or crotch area and that males involved in drug crimes often have female accomplices carry [the drugs] in their crotch area based on the belief that should apprehension occur, it is generally less likely that female officers would be available to search female suspects."

The trial court relied upon the information provided by the confidential informant, which was for the most part corroborated by the subsequent actions of Murfree, Evans and Defendant, as part of the basis for its conclusion that the search of Defendant was reasonable under the circumstances. The trial court also relied upon the following conclusion:

> In this instance the detectives had a reasonable basis for believing that contraband was hidden in [D]efendant's crotch area. This belief was founded upon the training and experience of the officers. The fact that rolling papers had been secreted in [D]efendant's bra and fell out when shaken and that [D]efendant had made several attempts to reach into her pants immediately prior to being search[ed].

We do not find the trial court's conclusion on this issue to be fully supported by its findings of fact. First, though there was evidence to support the trial court's finding of fact that rolling papers fell from Defendant's shirt when she was shaking her bra, this evidence came from the testimony of Defendant herself. Detective Curl testified that nothing fell from Defendant's shirt when Defendant shook her bra, and neither Detective Curl's nor Detective Dickerson's testimony included mention of any rolling papers. Therefore, there was no testimony from either detective supporting the trial court's conclusion that the rolling papers served as a basis for "believing that contraband was hidden in . . . [D]efendant's crotch area." Further, there was noth-

---

2. The trial court referred to these as "rolling papers used to roll marijuana cigarettes[.]"

STATE v. BATTLE

[202 N.C. App. 376 (2010)]

ing that occurred at the scene of the search to indicate that these papers were for the purpose of smoking marijuana. No marijuana was found on Defendant, in the Oldsmobile, or anywhere at the scene. There was no testimony that any officer smelled the odor of marijuana. Nor was there any evidence that suggested that anyone had used marijuana prior to the search. Rolling papers alone do not constitute contraband, as they are legal to purchase, legal to carry, and legal to use for tobacco smoking. Second, the trial court found as fact that Defendant on three occasions "reached down towards her pants." The trial court did not find as fact that Defendant "made several attempts to reach into her pants." The uncontroverted testimony of Detective Curl was that when Detective Curl first attempted to unzip Defendant's pants, Defendant "reached down to her pants . . . like she was gon' go inside the top of her pants." Detective Curl then said to Defendant "let me do this. And again . . . I reached to grab again, she reached down again. I told her a second time, no, let me do this." Then Detective Curl called Detective Dickerson over with the Taser, and on her third attempt, Detective Curl was able to unzip Defendant's pants and conduct the search without interference from Defendant. The evidence supports that Defendant twice reached towards the top of her pants as Detective Curl was attempting to unzip Defendant's pants, and that, according to Detective Curl, Defendant's actions were "like" Defendant was "going to go inside the top of her pants." We take judicial notice of the fact that Defendant's action—reaching towards the top front of her pants—was also consistent with a person who is about to have her pants unzipped by a stranger. *State v. Stone*, 362 N.C. 50, 55, 653 S.E.2d 414, 418 (2007).

We hold that the trial court's findings of fact do not support its conclusion of law that Defendant "made several attempts to reach into her pants[,]" as this conclusion calls for speculation on Defendant's intent that cannot be determined from the record evidence. *See State v. Coley*, 193 N.C. App. 458, 483, 668 S.E.2d 46, 62 (2008); *see also Fuller*, 950 F.2d at 1446 ("The fundamental question under the fourth amendment is whether 'the grounds for a search . . . satisfy *objective* standards' of reasonableness. *Torres v. Commonwealth of Puerto Rico*, 442 U.S. 465, 471, 61 L. Ed. 2d 1[, 8], 99 S. Ct. 2425[, 2429] (1979) (emphasis added)."). The fact that contraband was in fact found in Defendant's underwear did nothing to support Detective Curl's strip search of Defendant. Prior to completing the strip search, Detective Curl could only speculate as to the motive for Defendant's reaction to the attempt to unzip her pants pursuant to the strip search. *Coley*, 193 N.C. App. at 483, 668 S.E.2d at 62.

More relevant to our analysis, Defendant's reaction to Detective Curl's attempts to unzip her pants was not, as the trial court stated, "immediately prior to [Defendant's] being search[ed]." At the time Defendant reached towards the top of her pants, Detective Curl had already initiated the strip search, as she was in the process of attempting to unzip Defendant's pants. Defendant's actions during the strip search cannot retroactively serve as a basis for justifying that strip search. For a search to comply with the requirements of Fourth Amendment jurisprudence, there must be sufficient supporting facts and exigent circumstances *prior* to initiating a strip search to justify this heightened intrusion into a suspect's right to privacy. The trial court's findings of fact contain nothing that suggests Defendant was acting suspiciously before the strip search. The testimony of the detectives at the hearing was that Defendant was quiet and completely cooperative until Detective Curl began the strip search.

The trial court made no findings of fact or conclusions of law regarding any exigent circumstances that existed warranting the roadside strip search of Defendant. When asked why he stood next to Defendant holding a Taser during the strip search, Detective Dickerson replied: "Not knowing if [Defendant] was going to actively resist and if she had a weapon or anything of that nature on her person. At this time we didn't know that she had any drugs on her or not. It could have been a weapon." Detective Curl had already conducted the normal search incident to arrest, manual inspection over the top of Defendant's clothing, as well as reaching inside Defendant's pockets, without discovering anything suspicious. At the time Detective Curl initiated the strip search, there were no reasonable grounds to believe Defendant was concealing any weapon. There was no testimony indicating a belief that if Defendant was actually concealing drugs, that she was in a position to destroy or further hide that evidence. The record shows that the strip search was conducted on the mere *possibility* that drugs would be found on Defendant's person, based upon the confidential informant's tip. This fails to meet constitutional muster. *Schmerber*, 384 U.S. at 769-70, 16 L. Ed. 2d at 919. Murfree, and possibly Evans, had already been searched and no contraband had been recovered. The Oldsmobile had been searched, and other than the suspicious plastic bags, nothing had been recovered. Murfree's father was allowed to retrieve the Oldsmobile from the site of the stop that same afternoon.

**STATE v. BATTLE**

[202 N.C. App. 376 (2010)]

D. *The Place in which the Strip Search was Conducted*

"The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Lafayette*, 462 U.S. at 647, 77 L. Ed. 2d at 72 (holding that police practice of searching all containers carried by an arrestee upon entering a police station is not a violation of the Fourth Amendment even if less intrusive means were available). This does not mean, however, that the availability of less intrusive means play no role in the determination of the constitutionality of the scope of a search. The *Lafayette* Court illustrated this point in a way relevant to this case as already quoted above: "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street." *Id.* at 645, 77 L. Ed. 2d at 71.

Defendant was strip searched on the side of a street in broad daylight. There were vehicles driving by, people on their front porches, and a nursing home "slightly to the front of the vehicle[.]" Two male officers were present as the strip search was conducted by Detective Curl. "[W]e would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen." *Redding*, —— U.S. at ——, 174 L. Ed. 2d at 364. Though the trial court failed to include any findings of fact concerning the availability of less intrusive options for conducting the strip search, the record evidence is uncontroverted that the strip search was conducted right next to a large sports utility vehicle with "darkly tinted windows." *See United States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir. 1997) ("The officers knew that Moore had earlier that evening given $1,600 in marked money to [the defendants]. When all four of the [defendants] were searched and the money was not found, the decision was made to search the clothing of each of the [defendants]. [Defendant] Jacques Paul was placed in the jump seat of a police van, his trousers were pulled down and the $1,600 in marked money fell out. His boxer shorts were not removed. Under these circumstances, we conclude that the search in question was not an unconstitutional strip search. The search did not occur on the street subject to public viewing but took place in the privacy of the police van."). The State presented no evidence that an immediate roadside strip search of Defendant was necessary, nor that there were no more suitable locations nearby. *See State v. Darden*, 1999 Ohio App. LEXIS 5548, 16 (Ohio Ct. App., Montgomery County Nov. 24, 1999) (unpublished opinion) ("[T]he search had taken place in a men's restroom, where only the officers and sergeant involved in the

traffic stop had been present. Further, Officer Bergman testified that during the strip search, he had secured the door to assure that no one could have walked in while the search was in progress."); *see also United States v. Williams*, 477 F.3d 974, 977 (8th Cir. 2007). Detective Dickerson testified that the police station was at most a five minute drive away. *See Bazy*, 1994 U.S. Dist. LEXIS 14165 at 26 ("Probable cause that an arrestee is hiding something on his body does not justify conducting on a public street a strip search or some search akin to one. There must be other circumstances present which prevent an officer from waiting until the arrestee can be moved to a private location, like the station house."); *see also United States v. Murray*, 22 F.3d 1185 (D.C. Cir.1994).

IV.

Having examined the trial court's findings of fact and the uncontested evidence from the suppression hearing in light of the standard set forth in *Wolfish*, 441 U.S. at 559, 60 L. Ed. 2d at 481, we must now determine if the particular facts of this case demonstrate that Detective Curl violated Defendant's Fourth Amendment rights by conducting the strip search in light of all the surrounding circumstances. *Skinner*, 489 U.S. at 619, 103 L. Ed. 2d at 661.

Our Supreme Court has upheld a roadside strip search based in large part upon the reasoning in *Bazy*. *State v. Smith*, 342 N.C. 407, 464 S.E.2d 45 (1995) *(Smith II), adopting the dissent in State v. Smith*, 118 N.C. App. 106, 454 S.E.2d 680 (1995) *(Smith I*, and in conjunction with our Supreme Court's adoption of the dissent in *Smith I*, *Smith*). We therefore find it useful to compare the facts and circumstances of *Bazy* to those in this case. The court in *Bazy* went to great lengths to elucidate its understanding that a roadside strip search is justified only in the most unusual of circumstances. *Bazy*, 1994 U.S. Dist. LEXIS 14165 at 8-26 *(see*, e.g., "Because they are a serious intrusion into an individual's privacy, strip searches are justified in only certain circumstances and rarely, if ever, justified in public. Searches akin to strip searches can be justified in public places if limited in scope and required by unusual circumstances." *Id.* at 24.).

In *Bazy*, the United States District Court of Kansas found the following relevant facts: (1) The defendant was in lawful custody and probable cause existed for the defendant's arrest and a search incident to arrest. (2) Police canines trained in detecting controlled substances had indicated an interest in certain areas of the vehicle from which the defendant had been removed. (3) There had been sufficient

time before the defendant had been removed from the vehicle for him to hide on his person any contraband that might have been in the vehicle. (4) During a pat-down search, troopers had found a large "wad of small plastic bags." (5) "The troopers later found in the defendant Bazy's pants leg two blocks of a substance appearing to be crack cocaine." (6) "The troopers observed the defendant Bazy to continue squirming in apparent discomfort from sitting on something." *Id.* at 18-19. Based upon this evidence, the *Bazy* Court determined that probable cause existed for the troopers to believe that "Bazy was secreting drugs on his body[,]" and further determined that the "circumstances of this case plainly amount to a fair possibility that additional crack cocaine [other than that recovered from Bazy's pants leg] would be found on the defendant Bazy's body." *Id.*

The *Bazy* Court was particularly concerned with whether exigent circumstances warranted the search conducted. "The more difficult question is what exigent circumstance[s] justifie[d] conducting the search without a warrant. The court believes there are two circumstances coming together to constitute an emergency." *Id.* at 19. The *Bazy* Court first determined that the facts demonstrated a real possibility that the defendants had the intent and the potential to dispose of contraband.

> The first is the imminent destruction of evidence. Based upon the crack cocaine found in the defendant Bazy's pants leg, the troopers knew the drugs had been packaged in small amounts making them readily concealable and disposable. A trooper could have reasonably appreciated that the defendants, by concealing the drugs on their bodies, were able and awaiting the chance to dispose of it surreptiously. The reasonableness of this apprehension is proved first by the fact that the defendant Parker, while handcuffed, was able to remove one block from his body and to throw it under the patrol car. More proof is that the defendant Bazy had worked two of the blocks down his pants leg putting them in a position where he could shake and kick them away if the opportunity presented itself. There is also the likelihood that the defendants were squirming or moving in an effort to push the drugs deeper between the buttocks to avoid detection. The troopers appreciated these risks as shown in their warnings to the defendants to sit still.

*Id.* at 19-20. The second exigent circumstance found by the *Bazy* Court was the potential serious health risk to Bazy, specifically, the

risk that were Bazy to manage to push crack cocaine into his rectum, he would be at a high risk of an overdose.

> The other exigent circumstance is the health risk to the defendant. The troopers observed that Bazy appeared to be squirming in discomfort. The troopers suspected that the defendants may have hastily concealed the drugs on their bodies upon seeing the patrol car. A trooper could reasonably infer from this situation that the defendants did not anticipate carrying the drugs in their underwear or rectum and, thus, did not package the drugs so as to protect themselves. Based on these two circumstances together, the court believes an emergency existed which justified proceeding with the immediate roadside search without a warrant.

*Id.* at 20-21; *see also In re I.R.T.*, 184 N.C. App. 579, 587, 647 S.E.2d 129, 136 (2007) ("[E]xigent circumstances are also apparent in this case: Juvenile had drugs in his mouth and could have swallowed them, destroying the evidence or harming himself.").

The State presented *no* evidence of exigent circumstances in the case before us. One can speculate that Detective Curl was concerned that contraband might somehow be lost or destroyed absent the strip search, but this is always a potential issue when an arrest is made based upon suspected drug activity. Were we to hold that the facts and circumstances surrounding this case warrant a finding of exigent circumstances justifying a strip search, we would effectively be holding that exigent circumstances are established to justify roadside strip searches, *per se*, as long as police officers have probable cause to suspect drug activity. This was certainly not the holding in *Bazy*, and does not comport with established law that the State has the burden of proving a search did not violate a suspect's constitutional rights, *Gibson*, 32 N.C. App. at 586, 233 S.E.2d at 86, that *per se* rules are not appropriate when conducting Fourth Amendment analysis, *Stone*, 362 N.C. at 56-57, 653 S.E.2d at 419, and that the

> test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Wolfish*, 441 U.S. at 559, 60 L. Ed. 2d at 481.

*A* very recent United States Supreme Court opinion, *Redding,* *supra,* is helpful in our analysis, particularly because it was filed after all the previous authority cited, and after the authority cited in the State's brief. *Redding* involved what the United States Supreme Court effectively termed a strip search of Savana, a thirteen-year-old student, by school officials. The *Redding* Court

> recognized that the school setting "requires some modification of the level of suspicion of illicit activity needed to justify a search," and held that for searches by school officials "a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause[.]" We have thus applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student, and have held that a school search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction[.]"

*Redding,* —— U.S. at ——, 174 L. Ed. 2d at 361 (*citations to New Jersey v. T. L. O.,* 469 U.S. 325, 83 L. Ed. 2d 720 (1985) omitted). Thus, in a school setting, reasonable suspicion, not probable cause, is the standard applied. In *Redding,* the assistant principal of the school, Kerry Wilson (Wilson), summoned Savana to his office where he presented Savana with a day planner containing "several knives, lighters, . . . and a cigarette." *Redding,* —— U.S. at ——, 174 L. Ed. 2d at 360. Savana stated the day planner was hers, but that she had lent it to her friend, Marissa Glines (Glines) a few days prior, and that none of the items were hers. *Id.* Wilson then produced four prescription strength ibuprofen pills and one over-the-counter pill intended for pain relief and inflamation. All of these pills were considered contraband on school property without advance permission. Upon questioning, Savana denied knowledge of the pills. *Id.*

> Wilson then told Savana that he had received a report that she was giving these pills to fellow students; Savana denied it and agreed to let Wilson search her belongings. Helen Romero, an administrative assistant, came into the office, and together with Wilson they searched Savana's backpack, finding nothing.

> At that point, Wilson instructed Romero to take Savana to the school nurse's office to search her clothes for pills. Romero and the nurse, Peggy Schwallier, asked Savana to remove her jacket,

socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets), which she was then asked to remove. Finally, Savana was told to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree. No pills were found.

*Id.* Wilson had obtained plenary evidence from other students that supported a reasonable suspicion that Savana might be possessing or dealing in contraband. *Id.* at ——, 174 L. Ed. 2d at 362-63.

> This suspicion of Wilson's was enough to justify a search of Savana's backpack and outer clothing. If a student is reasonably suspected of giving out contraband pills, she is reasonably suspected of carrying them on her person and in the carryall that has become an item of student uniform in most places today. If Wilson's reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making. And the look into Savana's bag, in her presence and in the relative privacy of Wilson's office, was not excessively intrusive, any more than Romero's subsequent search of her outer clothing.

*Id.* at ——, 174 L. Ed. 2d at 363. However, the *Redding* Court determined: "Here, the content of the suspicion failed to match the degree of intrusion." *Id.* at ——, 174 L. Ed. 2d at 364. The *Redding* Court first noted that the contraband involved, while potentially dangerous, was not as dangerous as other drugs. *Id.* at ——, 174 L. Ed. 2d at 364-65.

> Nor could Wilson have suspected that Savana was hiding common painkillers in her underwear. Petitioners suggest, as a truth universally acknowledged, that "students . . . hid[e] contraband in or under their clothing," and cite a smattering of cases of students with contraband in their underwear[.] But when the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off. But nondangerous school contraband does not raise the specter of stashes in intimate places, and there is no evidence in the record of any general practice among Safford Middle School students of hiding that sort of thing in underwear; neither [of the students who provided evidence against Savana] suggested to Wilson that Savana was doing that, and the preceding search of Marissa that Wilson

ordered [a strip search identical to the one Savana was subjected to] yielded nothing.

*Id.* at ——, 174 L. Ed. 2d at 365. The *Redding* Court then emphasized:

> We . . . mean . . . to make it clear that the *T. L. O.* concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.

*Id.*

We recognize that the case before us is lacking the element of the young age of the person searched that is part of the analysis in *Redding*. We also recognize that the suspected drug, cocaine, involved in the case before us is inherently more dangerous than the drugs involved in *Redding*. However, we take from *Redding* that there must be more than the mere possibility that a female suspect could be hiding contraband in her underwear, such as Detective Curl's testimony that drugs are often hidden there, in order to justify an intrusion of the magnitude of a strip search. In *Redding*, there was a lower standard involved—reasonable suspicion rather than probable cause—and the strip search of Savana, in which she pulled her bra away from her body and shook it, and pulled her underwear away from her body as well, was conducted by a female nurse and another female school official in a private room. In neither case was there any evidence prior to the strip search that the suspect was, in fact, hiding contraband in her underwear.

Our Supreme Court has held unconstitutional a strip search similar to the one conducted in this case based upon its finding that the search went beyond the scope of the consent the defendant had given the officers. *Stone*, 362 N.C. 50, 653 S.E.2d 414. Because the search in *Stone* was initiated pursuant to the defendant's consent, the holding in *Stone* does not control the outcome of this case. Some of the analysis in *Stone*, however, is applicable to the facts involved here. The *Stone* Court dismissed the argument put forth by the State, and the dissent from our Court, that because "in a search for drugs, a suspect could reasonably expect some search of his genital area, such as 'a continuous sweeping motion over [the suspect's] outer garments[,]' " *id.* at 55, 653 S.E.2d at 418 (citation omitted), "that such touching is

no less intrusive than the flashlight-illuminated visual search conducted [in *Stone*]." *Id.* Our Supreme Court held that the visual inspection of the defendant's genitals was more intrusive than a pat-down search over the genital region, stating: "Although these events occurred at 3:30 a.m., the search occurred in the parking lot of an apartment complex, as opposed to a secluded area or police station. Both Officers . . . were present during the search." *Id.* at 56, 653 S.E.2d at 419. The *Stone* Court differentiated the facts in its case from those in *Smith, supra,* "where the officers had specific information that cocaine was hidden in the defendant's crotch." *Stone,* 362 N.C. at 56, 653 S.E.2d at 419 (citations omitted).

*Smith* represents the only North Carolina opinion dealing with a probable cause roadside strip search. In overturning our Court's holding that the search in *Smith* violated the Fourth Amendment, our Supreme Court adopted the dissent in *Smith I* without further opinion. *Smith II,* 342 N.C. 407, 464 S.E.2d 45.

In *Stone,* our Supreme Court explained its holding in *Smith* in the following fashion:

Although the defendant in *Smith* did not give consent, the officers *had probable cause and exigent circumstances, as well as a specific tip from an informant that defendant "would have the cocaine concealed in his crotch or under his crotch."* This Court reversed the Court of Appeals for the reasons stated in the dissenting opinion, holding that the scope of the search was not unreasonable.

*Stone,* 362 N.C. at 54, 653 S.E.2d at 417 (internal citations omitted) (emphasis added).

In *Smith,* evidence was presented at the suppression hearing that the arresting officer (Officer Cook) knew the defendant, and had worked in the relevant area of Fayetteville for several years and knew it to be an area with high drug activity. Officer Cook had been informed numerous times from different sources that the defendant was operating a drug house and selling drugs in that area. Confidential sources had informed Officer Cook that the defendant operated multiple drug houses, and gave Officer Cook a large quantity of information concerning the defendant's actions and methods of operation. Officer Cook received a call on 12 May 1992 at 12:15 a.m. from a confidential informant who had proved reliable in the past, and whose information had led to two arrests. The confidential

informant told Officer Cook that the defendant was carrying approximately $2,000.00, was driving a red Ford Escort with license plate EVN7322, and was *en route* to purchase cocaine. The confidential informant informed Officer Cook that upon returning from the purchase, the defendant would be going to Apartment 617-D Johnson Street, which the confidential informant described as the last apartment on the left. The confidential informant also told Officer Cook that the defendant would package the cocaine in aluminum foil while at the apartment, then go to a house on Buffalo Street off of Bragg Boulevard to deliver the cocaine for sale. The confidential informant stated when the defendant "departed [617-D] Johnson Street that he would have the cocaine concealed in his crotch, or under his crotch." *Smith I*, 118 N.C. App. at 107-08, 454 S.E.2d at 681-82.

Officer Cook picked up his partner and the confidential informant, and headed to Johnson Street. The confidential informant pointed out the apartment and the red Escort with license plate number EVN7322, and said that the defendant would be leaving the apartment soon. The officers, with the confidential informant, followed the red Escort for a distance, then activated their blue lights and stopped the defendant. The officers then conducted a search of the defendant, at approximately 1:30 a.m., which involved shining a flashlight on the defendant's private parts, and reaching underneath the defendant's scrotum to retrieve what was later confirmed to be cocaine. *Id.* at 108-09, 454 S.E.2d at 682. The trial court made findings of fact in support of this evidence. *Id.* at 110-11, 454 S.E.2d at 683.

The facts in the case before us are distinguishable from those in *Smith*. Perhaps most importantly, the reliable confidential informant in *Smith* not only provided very specific evidence concerning what the defendant's actions would be, most of which were verified by the officers before the defendant was stopped, the confidential informant specifically stated that *the defendant* would be hiding the cocaine *in the defendant's underpants*, and perhaps underneath the defendant's scrotum. Officer Cook had multiple sources indicating that the defendant was a serious drug dealer, and operated out of multiple locations. The search took place in the early morning hours, approximately 1:30 a.m., and nothing in *Smith* indicates that there were other people in the immediate vicinity other than the officers.

The search in the case before us was conducted in daylight, on a street with both pedestrians and vehicles in the immediate vicinity. No evidence was presented at the hearing, and thus no findings of fact were made, that the detectives had any evidence other than the

confidential informant's tip that Defendant had ever been involved in any drug activity whatsoever. There was no evidence presented that Detective Curl knew Defendant to have any prior history of purchasing drugs or drug use, much less drug sales. Detective Curl testified that there was not any specific information concerning who in the vehicle might have the drugs. Though the confidential informant's tip was confirmed in many aspects before the strip search, no drugs were found in the Oldsmobile or on Murfree, the main focus of the detectives. Most importantly, the confidential informant provided no information that Defendant would have drugs on her person, much less hidden in her underwear. *Stone*, 362 N.C. at 54, 653 S.E.2d at 417; *see also Murray*, 22 F.3d 1185; *Starks*, 6 F.Supp.2d 1084; *Bazy*, 1994 U.S. Dist. LEXIS 14165; *People v. Jones*, 3 Misc. 3d 481 (N.Y. Sup. Ct. 2004).

V.

We hold that the facts and circumstances in this case are distinguishable from those in *Smith*. Were we to uphold the strip search on the facts and circumstances of this case, we would be expanding the authority of the police to conduct roadside strip searches beyond what was allowed in *Smith*. In light of precedent set by the United States Supreme Court and our appellate courts, and our analysis of the opinions from other jurisdictions involving the Fourth Amendment rights implicated in this case, we believe Defendant's Fourth Amendment rights were violated by the strip search in this case. The scope of the intrusion was great, the manner in which it was conducted was inappropriate in light of the circumstances, the justification for initiating it was slight, and the place in which it was conducted was one likely to increase the humiliation suffered by Defendant as a result of the strip search.

The trial court made no findings of fact or conclusions of law concerning the necessity of conducting the strip search at that time and at that location. Phrased another way, there is nothing in the trial court's order stating that there were exigent circumstances justifying any search more intrusive than that allowed incident to any arrest. The lack of findings or conclusions on this matter alone require vacating the trial court's order. *See State v. Coplen*, 138 N.C. App. 48, 52-58, 530 S.E.2d 313, 317-20 (2000); *see also Paulino v. State*, 924 A.2d 308, 319 (Md. 2007); *State v. Walker*, 1998 Ohio App. LEXIS 3466, 23-24 (unpublished opinion). Upon reading the suppression hearing testimony, the lack of findings and conclusions on this matter are understandable. The State presented no evidence of exigent circumstances at the hearing.

> There was no testimony at the suppression hearing in the case *sub judice*, that [the defendant] was attempting to destroy evidence, nor that he possessed a weapon such that an exigency was created that would have required the police officers to search [the defendant] at that precise moment and under the circumstances[.]

*Paulino*, 924 A.2d at 319.

> Without the constitutional safeguards of exigent circumstances and reasonableness, every search incident could result in a strip search. As we have said, "[t]he meaning of exigent circumstances is that the police are confronted with an emergency— circumstances so imminent that they present an urgent and compelling need for police action."

*Id.* at 315 (citation omitted). The stop initiated upon the tip provided by the confidential informant in this case is about as run-of-the-mill as can be imagined. Were we to affirm the order of the trial court, we would in effect sanction a *per se* rule that roadside strip searches of suspects are allowed as long as a reliable informant has provided information sufficient to give rise to probable cause that a suspect is carrying contraband, so long as some measures are taken to shield the suspect's private parts from public view. "Strip searches . . . are not a matter of course for searches incident either to arrest or detention." *Bazy*, 1994 U.S. Dist. LEXIS 14165 at 14. "This court shares the same reluctance and concern expressed above by the circuit court [concerning] such searches. Public intrusive searches of the body should never be commonplace but reserved for only the most unusual cases." *Id.* at 25-26.

We find the great weight of authority supports our holding that the roadside strip search of Defendant in this case constituted a violation of Defendant's Fourth Amendment right against unreasonable searches and seizures. We therefore vacate the order of the trial court denying Defendant's motion to suppress, and remand to the trial court for entry of an order granting Defendant's motion to suppress, and hereby grant Defendant a new trial.

Vacated and remanded; new trial.

Judge JACKSON concurs in the result only.

Judge STEELMAN concurs with a separate opinion.

STEELMAN, Judge, concurring.

In the case of *State v. Stone*, 362 N.C. 50, 653 S.E.2d 414 (2007), our Supreme Court held that a less-intrusive search, conducted with at least questionable consent, was not permissible under the Fourth Amendment to the United States Constitution. Because the instant search was more intrusive than that in *Stone*, with no consent, it was not permissible under the Fourth Amendment.