STATE OF NORTH CAROLINA v. ALFREDO F. SMITH, JR.

No. 9412SC419

(Filed 7 March 1995)

### 1. Searches and Seizures § 26 (NCI4th)— warrantless search of defendant—information from confidential informant—probable cause

Officers had probable cause to conduct a warrantless search of defendant at an intersection under the totality of the circumstances and exigent circumstances existed to make the warrantless search valid where the evidence showed that one officer received a phone call at 12:15 a.m. from an informant he had used on two prior occasions that had led to arrests; the informant told the officer what defendant would be driving and the license tag number, and that defendant would be picking up cocaine, taking it to a particular apartment, packaging it, and taking it to a particular house to sell it; the informant also stated that defendant would have the cocaine concealed in his crotch area; the officers independently corroborated the information received from the informant except that defendant had successfully concealed the cocaine on his person; the officers apprehended defendant at 1:30 a.m.; the officer was familiar with the drug area of the city and had received on numerous occasions from numerous sources information that defendant was operating houses out of which drugs were sold; and, had the officers taken the time to obtain a search warrant, the delay might have caused defendant's escape and disappearance or destruction of the controlled substances.

**Am Jur 2d, Searches and Seizures § 69.**

### 2. Searches and Seizures § 2 (NCI4th)— strip search at intersection—unreasonable search

A warrantless search of defendant was intolerable in its intensity and scope and therefore unreasonable under the Fourth Amendment where police searched defendant by pulling his pants down far enough that an officer could see the corner of a small

paper towel underneath defendant's scrotum, and this search took place in the middle of an intersection of two main thoroughfares at 1:30 a.m.

**Am Jur 2d, Searches and Seizures § 5.**

**Law enforcement officer's authority, under Federal Constitution's Fourth Amendment, to stop and briefly detain, and to conduct limited protective search of or "frisk," for investigative purposes, person suspected of criminal activity—Supreme Court cases. 104 L. Ed. 2d 1046.**

Judge WALKER concurring in part and dissenting in part.

Appeal by defendant from judgments entered 11 February 1993 in Cumberland County Superior Court by Judge E. Lynn Johnson. Heard in the Court of Appeals 24 January 1995.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Robin P. Pendergraft for the State.*

*Beaver, Holt, Richardson, Sternlicht, Burge & Glazier, P.A., by Richard B. Glazier, for defendant-appellant.*

GREENE, Judge.

Alfredo F. Smith, Jr. (defendant) appeals from judgments entered 11 February 1993 in Cumberland County Superior Court, after a jury found him guilty of one count of intentionally keeping and maintaining a vehicle used for the purpose of unlawfully keeping or selling controlled substances and one count of possession with intent to manufacture, sell and deliver a controlled substance. Defendant received fifteen years imprisonment.

Defendant was indicted for maintaining a vehicle to keep and sell controlled substances and for possession with intent to manufacture, sell and deliver a controlled substance on 27 July 1992. On 10 February 1993, defendant filed a pre-trial motion to suppress evidence and an affidavit supporting this motion, claiming the search and seizure of defendant on 12 May 1992 was illegal. Before trial, the trial court conducted a suppression hearing on defendant's motion.

The State's evidence tended to show the following: Officer Cook has known defendant for the two to three years prior to 12 May 1992 he has worked in the Bonnie Doone area of Fayetteville, an area

STATE v. SMITH

[118 N.C. App. 106 (1995)]

known to have a drug problem. Officer Cook described the Bonnie Doone area as a "large housing area with a main thoroughfare, Bragg Boulevard, running through it. . . . [F]rom Bragg Boulevard would be Johnson Street, Andy Street, Mike Street, the main thoroughfares." Prior to 12 May 1992, Officer Cook had been informed numerous times from different sources that defendant was operating a drug house and selling drugs in the Bonnie Doone area. Confidential sources told him defendant "had houses that he was selling drugs from" and "was in charge of some of the people who were staying in the houses, that he delivered the drugs to them, and they in turn sold them for him, and he received the profits."

At 12:15 a.m. on 12 May 1992, Officer Cook received a call from a source he had used two times in the past "where arrests had been made and narcotics were seized" and whom Officer Cook knew to be a reliable source. The informant told Officer Cook that defendant had approximately two thousand dollars in his possession, was operating a red Ford Escort with the license plate EVN7322, and was going to an unknown location to purchase cocaine. The informant said that once defendant had purchased the cocaine, he would be returning to an apartment, 617-D Johnson Street, which the informant described as the last apartment on the left. The informant also told Officer Cook that once defendant returned to 617-D, defendant would be packaging the cocaine in aluminum foil and going shortly thereafter to a house on Buffalo Street off of Bragg Boulevard to deliver the cocaine, where it would be sold. The informant stated when defendant "departed [617-D] Johnson Street that he would have the cocaine concealed in his crotch, or under his crotch."

Officer Cook immediately called his partner, Officer O'Briant and contacted his supervisor. He then met Officer O'Briant in the Bonnie Doone area, picked up the informant, and had him take the officers to Johnson Street. As they approached the last apartment on the left, the informant pointed out a red Ford Escort outside the apartment and stated "that's the vehicle" and that defendant "would be leaving quickly" and "wouldn't stay there long." The officers, in two separate vehicles, backed down the road to avoid detection and released the informant. It was approximately 1:15 a.m. on 12 May 1992.

At approximately 1:30 a.m. on 12 May 1992, the red Ford Escort pulled out of the dirt road onto Johnson Street and turned right on Johnson Street toward Bragg Boulevard. The license plate on this red Ford Escort was EVN7322. The officers turned on their blue lights

STATE v. SMITH

[118 N.C. App. 106 (1995)]

and stopped defendant in "the center lane, the left turn lane" where Johnson Street "came to Bragg Boulevard." After they identified themselves and told defendant they had information he was transporting cocaine in his vehicle, Officer Cook conducted a weapons search or pat-down search of defendant and of his vehicle. Officer Cook then informed defendant he was going to search him completely using his flashlight and hands. He asked defendant "to step behind the car door of [defendant's] vehicle, which was open, and [Officer Cook] stood in between him and the car door on the outside." Officer Cook then informed defendant he believed defendant had concealed cocaine inside his underwear and asked him to open his trousers. Officer Cook stood between defendant and the "doorway" because he "didn't want to expose him to other cars, the public, to embarrass him, that sort of thing." Because Officer Cook could not see underneath defendant's scrotum and testicles and could not see anything to the back or front of defendant, he asked him to pull his underwear down further. Because defendant resisted to pulling his underwear down further, Officer Cook testified, "I walked to the front of [defendant] and held open his underwear . . . and slid it down. At which point with my flashlight I could see the corner of a small paper towel underneath his scrotum. I then pulled his underwear farther. [Defendant] resisted a little bit. I pushed him back into the door and reached into, uh—underneath his scrotum and removed the paper towel" which contained crack cocaine. After the police executed a search warrant, they found out the last apartment on the left which the informant had pointed out was actually 617-F Johnson Street. They did not find anything in 617-D.

Defendant testified that on 12 May 1992, he had been at 617-F Johnson Street prior to 1:15 a.m. He stated that Johnson Street is a one-lane road, "but as you approach Bragg Boulevard, it become [sic] a two-lane road towards the intersection." After he was stopped by Officers Cook and O'Briant, he asked them what the probable cause was for stopping him and refused search of the car. Defendant testified that he agreed to the search of his vehicle after Officer O'Briant threatened to hit him. After searching the vehicle, Officer Cook asked defendant to pull his underwear down, and defendant pulled out his "short set, along with the underwear, and show[ed] him [his] testicles." Officer Cook then asked defendant to turn around. Defendant refused, stating "[y]ou are not searching me in my rear, in my butt, in the middle of the street. . . . We [sic] standing in the middle of the intersection of Bragg Boulevard and Johnson Street. He wants to

search my rear." Officer Cook grabbed defendant's "short set" and underwear, "pulled it down, and shined his flashlight in [his] butt."

Officer Cook then instructed defendant to stand next to Officer O'Briant while he conducted a second search of the car. When he finished, he told defendant he wanted to search him again, but defendant refused. The officers each grabbed one of defendant's hands and searched defendant again, which resulted in finding the cocaine.

Based on the testimony received at the suppression hearing, the court made the following pertinent findings of fact:

2. That Mr. Cook is familiar with the way drugs are sold in the Cumberland County community. And that prior to May 12, 1992, that Deputy Sheriff Cook had worked the Bonnie Doone area for approximately a two to three year period prior to that date and time.

3. That prior to May 12th, 1992, Mr. Cook had known the defendant for a substantial period of time prior thereto and was familiar with the way drugs were sold in the Bonnie Doone community, being through various street dealers and inside various residences located in that community. . . .

4. That over a period of time preceding May 12, 1992, Mr. Cook and other members of the Special Operations Unit had received numerous pieces of information concerning the way the defendant operated a drug organization in the Bonnie Doone community, operating through various drug houses, selling drugs from various street—selling drugs through various street dealers, and operating houses where prostitutes also operated. . . .

6. . . . the confidential source of information had at least on two prior occasions furnished very specific information concerning drugs and that such information furnished to Deputy Sheriff Cook had lead [sic] to at least two arrests; that at least one other officer had also used the same informant on a prior date and time and that the information furnished by the informant had always proved to be reliable.

The court also found that the informant had told Officer Cook defendant would be driving a red Ford Escort with license plate number EVN7322 on 12 May 1992, would be returning to an apartment on Johnson Street, identified as the last apartment on the left, and that defendant would be packaging cocaine and leaving the apartment

**STATE v. SMITH**

[118 N.C. App. 106 (1995)]

with the packaged cocaine concealed in his crotch area. The court found that thereafter, Officers Cook and O'Briant observed the red Ford Escort outside the last apartment on the left on Johnson Street, informant stated "that's the vehicle," and the officers observed the Escort leave. After the officers stopped the Escort, they identified defendant as the driver, searched him and found cocaine in a paper towel concealed in defendant's scrotum area. Based on these and other findings, the trial court concluded there was probable cause "for the stop and search of the red Ford Escort automobile and the subsequent search of the defendant," "[t]hat none of the defendant's rights under the Fourth Amendment of the United States Constitution or the equivalent provision of the North Carolina Constitution have been violated," and "[t]hat none of the defendant's statutory rights under the laws of the State of North Carolina have been violated." The court therefore denied defendant's motion to suppress to which defendant objected.

---

The issues presented are whether (I) under the totality of the circumstances, there was probable cause and an exigency for a warrantless search of defendant; and (II) the search was reasonable in scope.

I

[1] In reviewing the denial of a motion to suppress, we are limited to determining whether the trial court's findings of fact are supported by competent evidence and whether the findings of fact in turn support legally correct conclusions of law. *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Although defendant had the burden of producing a supporting affidavit under his motion to suppress, the State "still has the burden of proving that the evidence was lawfully obtained." *State v. Gibson*, 32 N.C. App. 584, 586, 233 S.E.2d 84, 86 (1977); *see also State v. McCloud*, 276 N.C. 518, 173 S.E.2d 753 (1970) (one who seeks to justify warrantless search has burden of showing exigencies of situation made search without warrant imperative). Defendant concedes in his brief that "reasonable suspicion existed to justify a Terry stop and frisk"; however, he argues "this suspicion clearly did not rise to the level of probable cause" to justify a warrantless search of defendant. We disagree.

If probable cause to search exists and the exigencies of the situation make a warrantless search necessary, it is lawful to conduct a warrantless search. *State v. Mills*, 104 N.C. App. 724, 730, 411 S.E.2d

STATE v. SMITH

[118 N.C. App. 106 (1995)]

193, 196 (1991). " 'Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' " *State v. Zuniga*, 312 N.C. 251, 261, 322 S.E.2d 140, 146 (1984) (*quoting Brinegar v. United States*, 338 U.S. 160, 175-76, 93 L.Ed. 1879, 1890, *reh'g denied*, 338 U.S. 839, 94 L.Ed 513 (1949)). "Probabilities . . . are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved." *Id.*

The United States Supreme Court determined that when deciding whether information received from a confidential informant properly forms the basis of probable cause to search or arrest, courts must review the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, *reh'g denied*, 463 U.S. 1237, 77 L. Ed. 2d 1453 (1983); *see State v. Riggs*, 328 N.C. 213, 219, 400 S.E.2d 429, 433 (1991) (North Carolina Supreme Court has accepted *Gates* as appropriate standard for showing probable cause under both federal and state constitutions). The Court emphasized that "[o]ur decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Gates*, 462 U.S. at 241, 76 L. Ed. 2d at 550. The Court emphasized that "probable cause does not demand the certainty we associate with formal trials." *Id.* at 246, 76 L. Ed. 2d at 553. Therefore, it is enough if there is a "fair probability" that a confidential informant obtained his entire story either straight from a defendant or from someone he trusted, and corroboration of "major portions of the [informant]'s predictions provides just this probability." *Id.*

Based on these principles, the officers in this case had probable cause to search defendant on Bragg Boulevard under the totality of the circumstances. The State's evidence shows Officer Cook received a phone call at 12:15 a.m. on 12 May 1992 from an informant he had used on two prior occasions that had led to arrests. The informant told Officer Cook that defendant would be driving a red Ford Escort with license plate EVN7322, would be picking up cocaine, would be arriving at the last apartment on the left on Johnson Street to package the cocaine in aluminum foil, would be going to a house on Buffalo Street off of Bragg Boulevard to deliver the cocaine, where it would be sold, and would have the cocaine concealed in his crotch or

under his crotch. Based on this information, Officer Cook met Officer O'Briant at approximately 1:30 a.m. and picked up the informant. Once they were near the last apartment on the left on Johnson Street, the informant pointed out a red Ford Escort outside the apartment and stated "that's the vehicle." At approximately 1:30 a.m. on 12 May 1992, the red Ford Escort with license plate EVN7322, with defendant driving, pulled out of the dirt road onto Johnson Street and turned right on Johnson Street toward Bragg Boulevard.

Officers Cook and O'Briant independently corroborated the information received from the confidential informant except that defendant had successfully concealed the cocaine on his person. The informant in this case provided detailed predictions of defendant's future actions ordinarily not easily predicted. Furthermore, Officer Cook was familiar with defendant, familiar with the drug area of Fayetteville, and had received on numerous occasions from numerous sources information that defendant was operating houses out of which drugs were sold. The officers therefore had reasonable grounds to believe the remaining unverified information, that defendant did conceal drugs in his underwear for transport, was likewise true. Considering all these facts and circumstances together, "a man of reasonable caution" would believe that "an offense has been or is being committed."

Exigent circumstances also existed to make the warrantless search of defendant valid. In this case, the information received by Officer Cook revealed that defendant was going to obtain drugs and then deliver them to another location. If the officers had "taken the time to obtain a search warrant, the delay might have caused a 'probable absence of the purported drug violator' " and also the probable disappearance or destruction of the controlled substances. *Mills*, 104 N.C. App. at 731, 411 S.E.2d at 197. Accordingly, the officers conducted a lawful search of defendant based upon probable cause and the existence of exigent circumstances, and there was competent evidence to support the trial court's findings of fact and conclusions of law in denying defendant's motion to suppress. *See Gates*, 462 U.S. 213, 76 L. Ed. 2d 527 (because drug agents independently corroborated anonymous letter that defendants were drug dealers and traveled to Florida from Indiana to transport drugs, probable cause existed); *Draper v. United States*, 358 U.S. 307, 3 L. Ed. 2d 327 (1959) (information of Draper's clothing, that he would be walking fast, that he would be arriving on a train from Chicago, and that he would be carrying heroin supplied probable cause because officer had verified

every facet of information given him except whether Draper had heroin on him or in his bag which officer could accept as true).

## II

[2] Defendant also argues that even if probable cause existed, the search of defendant nevertheless "violated the Fourth Amendment through its intolerable intensity and scope." We agree.

Initially, we note the trial court did not make specific findings of fact regarding the reasonableness of the actual search of defendant, but concluded "none of the defendant's rights under the Fourth Amendment of the United States Constitution or the equivalent provision of the North Carolina Constitution have been violated"; however, because there is no material conflict in the evidence regarding the actual search of defendant, findings on this issue are not necessary, though the better practice is to find facts. *State v. Edwards*, 85 N.C. App. 145, 148, 354 S.E.2d 344, 347, *cert. denied*, 320 N.C. 172, 358 S.E.2d 58 (1987). We therefore determine whether the State has met its burden of proving the search of defendant was reasonable in its scope, thereby supporting the trial court's conclusion none of defendant's Fourth Amendment rights were violated. *Gibson*, 32 N.C. App. at 586, 233 S.E.2d at 86.

The Fourth Amendment's prohibition against unreasonable searches and seizures is "broad and unqualified," "makes no differentiation between persons and property," and "should be construed 'liberally to safeguard the right of privacy.' " *Blackford v. United States*, 247 F.2d 745, 750 (9th Cir. 1957), *cert. denied*, 356 U.S. 914, 2 L. Ed. 2d 586 (1958). A "search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 17, 20 L. Ed. 2d 889, 903-04 (1968). In determining whether or not conduct is unreasonable, "[t]here is no slide-rule formula," and "[e]ach case must turn on its own relevant facts and circumstances." *Blackford*, 247 F.2d at 751. In determining reasonableness, courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559, 60 L. Ed. 2d 447, 481 (1979). As such, the necessary scope of a search may vary depending on whether the search is conducted before police have effected an arrest, at the time and place of arrest, or at the station house.

Police conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and

privately—be performed at the station. For example, the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him, although that step would be rare.

*Illinois v. Lafayette*, 462 U.S. 640, 645, 77 L. Ed. 2d 65, 71 (1983). "[T]he presence of probable cause to arrest, when the police have not effected an arrest, permits a more limited search than that permitted incident to arrest." *United States v. Alexander*, 755 F. Supp. 448, 454 (D.D.C. 1991), *aff'd*, 961 F.2d 964, *cert. denied*, — U.S. —, 121 L. Ed. 2d 117 (1992). Furthermore, "[s]earches akin to strip searches can be justified in public places if limited in scope and required by unusual circumstances." *United States v. Bazy*, 1994 WL 539300 (D. Kan. 1994) (because defendant was not required to disrobe or submit to visual body cavity search and public view was blocked by defendant's clothes, troopers, and the patrol cars, and unusual circumstances for immediate search existed, trooper's reaching into defendant's underwear to remove crack cocaine was reasonable). Under these principles and in balancing the scope of the search against exigent circumstances in determining reasonableness, courts have allowed highly intrusive warrantless searches of individuals where exigent circumstances are shown to exist, such as imminent loss of evidence or potential health risk to the individual. *See Bazy*, 1994 WL 539300 (where officers knew defendant was concealing drugs in rear of his pants, there was danger of imminent destruction of evidence, and there was health risk to defendant, search of defendant by loosening his pants and removing drugs resting against defendant's buttocks was reasonable without search warrant); *Alexander*, 755 F. Supp. 448 (search of defendant's person by reaching inside underwear on public sidewalk reasonable in view of exigent circumstances that delay in search could enable defendant to dispose of drugs in private in bathroom).

Based on these factors for determining reasonableness, the State has not produced evidence to show that the police in this case, although having probable cause to search defendant without a warrant, were reasonable in the manner in which they conducted the search of defendant. The State's evidence shows the police searched defendant by pulling his pants down far enough that Officer Cook could see the corner of a small paper towel underneath defendant's scrotum. The State's evidence also shows that Officer Cook stood between defendant and the doorway to defendant's car when con-

ducting the search in the middle of an intersection of two main thoroughfares at 1:30 a.m. The State's evidence does not show, however, that where Officer Cook stood or the time the search occurred somehow protected defendant from the view of passing drivers. Furthermore, the State's evidence does not show whether the area was well-lit or dimly lit or whether there were passing cars, if any. We realize that "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means," *Lafayette*, 462 U.S. at 647, 77 L. Ed. 2d at 72, and that the government has an interest in stopping drug trafficking; however, the officers in this case could have easily employed other means of conducting their search of defendant which would have been more protective of defendant's privacy interests. For example, the officers could have searched defendant in the patrol car or effected an arrest and searched defendant at the stationhouse. *See Mills*, 104 N.C. App. 724, 411 S.E.2d 193 (factors establishing probable cause to arrest also establish probable cause to search where facts within officers' knowledge and of which they had reasonably trustworthy information sufficient to warrant man of reasonable caution in belief offense has been committed). The search of defendant in this case was akin to a strip search in a public place and was not "limited in scope" nor "required by unusual circumstances." There is nothing under the facts of this case to suggest that defendant could have disposed of the drugs before being placed in the patrol car or taken to the station. Under these circumstances, the search of defendant was intolerable in its intensity and scope and therefore unreasonable under the Fourth Amendment. For these reasons, the trial court erred in denying defendant's motion to suppress, and defendant is entitled to a new trial.

Reversed and remanded.

Judge EAGLES concurs.

Judge WALKER concurs in part and dissents in part.

Judge WALKER concurring in part and dissenting in part.

I concur in the majority opinion that there was probable cause and an exigency for a warrantless search of defendant. However, I respectfully dissent from the Court's holding that the search of

defendant was "intolerable in its intensity and scope and therefore unreasonable under the Fourth Amendment."

The majority cites *United States v. Bazy* for the proposition that "[s]earches akin to strip searches can be justified in public places if limited in scope and required by unusual circumstances." *Bazy*, 1994 WL 539300, at 8 (D. Kan.). I believe the facts and holding of *Bazy* suggest that such a search was justified under the circumstances of the instant case. In that case, officers stopped Bazy and a companion on the Kansas Turnpike at 8:30 A.M. A search of both men followed, during which "[t]he troopers unbuckled Bazy's pants and pulled them away from his waist and checked his underwear for drugs." A plastic bag containing cocaine was found lodged between Bazy's buttocks. A trooper then reached into Bazy's pants and pulled out the bag. The search occurred "on the grassy edge of the roadway between [Bazy's] car and a patrol car" and Bazy "was not exposed to the view of oncoming traffic, as the view was obstructed by the patrol car and by a trooper standing in front of him." *Id.* at 3. The defendant contended that the search was overly intrusive and not justified at the time and place, and that the public location of the search was embarrassing and humiliating. *Id.* The court found that the search, "[w]hile plainly more than a pat-down search," was nonetheless still limited in scope and intensity such that it did not violate the Fourth Amendment. *Id.* at 7. The court recognized that other less intrusive means for searching Bazy may have been available but said that " '[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of' " these less intrusive means. *Id.* (citations omitted). The court refused to "second guess the troopers on this procedure. The court [was] satisfied . . . that the troopers took the necessary and reasonable precautions to prevent the public exposure of the defendant Bazy's private parts." *Id.*

The search in the instant case took place at approximately 1:30 A.M. at the intersection of two streets in Fayetteville. The record does not reveal the conditions at the time, and defendant's objection was that he did not want the officer to "search [his] rear" in "the middle of the street."

Here the evidence does show that prior to the search Officer Cook asked defendant to step behind the open car door of his vehicle and that he positioned himself between defendant and the car door on the outside. Officer Cook said he took these steps "because [he] didn't want to expose [defendant] to other cars, the public, to embar-

AIR-A-PLANE CORP. v. N.C. DEPT. OF E.H.N.R.

[118 N.C. App. 118 (1995)]

rass him, that sort of thing." Defendant did not dispute this testimony. Considering the totality of the circumstances, I believe that the officers here, like the trooper in *Bazy*, took "the necessary and reasonable precautions to prevent the public exposure of defendant['s] . . . private areas." While there may have been other less intrusive means of conducting the search, I agree with the *Bazy* court that the availability of those less intrusive means does not automatically transform an otherwise reasonable search into a Fourth Amendment violation.

Just as the court in *Bazy* was unwilling to second guess the procedures used by the officers in that case, I am unwilling to second-guess the trial court's finding here that the officers' conduct during the search did not violate defendant's Fourth Amendment rights. The trial court in ruling on defendant's motion to suppress had the arguments of both parties before it and was in a superior position to evaluate the reasonableness of the search. I do not believe defendant is entitled to a new trial, and I would affirm the trial court in all respects.