STATE OF NORTH CAROLINA v. JEROME ROBINSON, JR.

No. COA11-1163

(Filed 19 June 2012)

**1. Search and Seizure—motion to suppress drugs—single pat-down search conducted in fluid manner**

The trial court did not err in a felonious possession of cocaine case by denying defendant's motion to suppress even though defendant contended the detective conducted two separate searches of his person with the second search allegedly violating his rights. The detective's testimony described a single pat-down search conducted in a fluid manner following defendant's removal from the car.

**2. Search and Seizure—probable cause—possession of drugs—hiding evidence between buttocks—suspicious behavior**

The trial court did not err in a felonious possession of cocaine case by concluding that probable cause arose when the detective felt something hard between the defendant's buttocks outside of defendant's clothing. The circumstances surrounding the detective's encounter with the suspicious behaving defendant would warrant a man of reasonable caution to believe that defend-

ant was in possession of drugs and was hiding evidence which would incriminate him.

**3. Search and Seizure—search of defendant's buttocks—not a strip search—exigent circumstances not required—steps to protect privacy**

The trial court did not err in a felonious possession of cocaine case by concluding that the search of defendant's buttocks was not a strip search and that exigent circumstances were not required. The detective had ample basis for believing that contraband would be discovered beneath defendant's underclothing, and the detective took certain steps to protect defendant's privacy.

Judge ELMORE dissenting.

Appeal by defendant from judgment entered 14 February 2011 by Judge Robert T. Sumner in Mecklenburg County Superior Court. Heard in the Court of Appeals 8 February 2012.

*Attorney General Roy Cooper, by Associate Attorney General Erica Garner, for the State.*

*Unti & Lumsden LLP, by Sharon L. Smith, for Defendant-appellant.*

ERVIN, Judge.

Defendant Jerome Robinson, Jr., appeals from a judgment imposing a four to five month suspended sentence upon Defendant and placing Defendant on supervised probation for a period of twenty-four months based on Defendant's plea of guilty to one count of felonious possession of cocaine. On appeal, Defendant challenges the denial of his motion to suppress evidence seized at the time of his arrest. After careful consideration of Defendant's challenge to the trial court's judgment in light of the record and the applicable law, we conclude that the trial court's judgment should remain undisturbed.

I. Factual Background

A. Substantive Facts

Shortly after midnight on 5 March 2009, Detective Brad Tisdale and Officer M.D. Pittman of the Charlotte-Mecklenburg Police Department were on patrol in a marked vehicle in the Lakewood community in Charlotte. At that time, the officers noticed three men

sitting in a car parked in a parking lot on Grant Street, a two-way road that ran through the parking lot of an apartment complex. After the officers stopped the patrol vehicle and approached the car to talk with the men, Detective Tisdale went to the driver's side window while Officer Pittman moved towards the passenger side.

As he spoke with the driver, Detective Tisdale noticed that Defendant, who was located in the rear seat behind the driver, held a large number of bills of varying denominations. At the same time, Officer Pittman told Detective Tisdale that there was a machete in the front seat between the driver and the front seat passenger and asked the latter to get out of the car. While Detective Tisdale continued speaking with the driver, Defendant dropped the money that he was holding onto the floor of the car and "suddenly move[d] back, lift[ed] up his waist area, and place[d] his hands behind his back."

After the front seat passenger left the car, Officer Pittman observed crack cocaine "in plain view" in the front right passenger seat and placed the front right passenger "into custody for drug related offenses." At that point, Detective Tisdale "ordered [Defendant] to exit the vehicle" and "immediately conducted a pat-down" while Defendant stood "next to the vehicle." Detective Tisdale performed a complete pat-down, "from the top to bottom," including reaching "down to the waistline . . . . all the way down past [Defendant's] knees to [his] ankles" and moving his hands "in a forward motion between [his] crotch and buttocks area." When Detective Tisdale "move[d] to [Defendant's] crotch area," he placed his "hand, flat hand, between his crotch area and his buttocks, [and] felt a hard-like substance between [Defendant's] buttocks." Based on his training and experience in "encountering numerous subjects that concealed illegal narcotics in the buttocks area," Detective Tisdale "immediately placed [Defendant] in cuffs and escorted him over to [his] vehicle, to a secure area" in order to "conduct a more thorough search."

Detective Tisdale's vehicle was located about twenty feet away from the point at which the pat-down had occurred. Upon reaching that location, Detective Tisdale opened the rear door of the car and positioned Defendant between that door and the passenger seat. Detective Tisdale testified that:

> I asked [Defendant] to lean forward by the waist. As he leaned forward by the waist, I had my flashlight. I looked down the rear of his pants where I [had] felt the hard-like substance. I saw a clear plastic bagg[ie] protruding out from his buttocks. I immedi-

ately asked [Defendant] to spread his buttocks apart so the item could fall out. He complied. The crack cocaine was packaged in a clear plastic bagg[ie]. It fell out of his pants. He was able to shake it down. It went down his pants leg and down to the ground. I then secured the cocaine.

Although Detective Tisdale did not insert his hands or the flashlight into Defendant's pants or pull Defendant's pants down, he did have "[Defendant] lean forward by the waist and spread [his] butt cheeks far" and pulled the waistband of Defendant's pants back "maybe half a foot at most" so he "was able to see down inside the rear of his pants." According to Detective Tisdale, no one else was present at the time that he searched Defendant and discovered the crack cocaine.

### B.  Procedural History

On 5 March 2009, a Magistrate's Order charging Defendant with felonious possession of cocaine was issued. On 22 March 2010, the Mecklenburg County grand jury returned a bill of indictment charging Defendant with felonious possession of cocaine. On 27 September 2010, Defendant filed a motion seeking to have the evidence seized at the time of his arrest suppressed on the grounds that it had been obtained as the result of an "illegal and unconstitutional stop and seizure." On 10 February 2011, Judge Kevin M. Bridges entered an order denying Defendant's suppression motion.

On 14 February 2011, Defendant filed a notice reserving the right to seek appellate review of the order denying his suppression motion in the event that he entered a plea of guilty. On the same date, Defendant entered a plea of guilty to felonious possession of cocaine pursuant to a plea agreement in which the State agreed, in return for Defendant's plea, to recommend that Defendant be sentenced to a term of four to five months imprisonment, with this sentence to be suspended and with Defendant to be placed on supervised probation. The trial court accepted the parties' plea arrangement and entered judgment accordingly. Defendant noted an appeal to this Court from the trial court's judgment.

### II.  Legal Analysis

### A.  Standard of Review

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclu-

sions of law. However, when, as here, the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal. Conclusions of law are reviewed *de novo* and are subject to full review. 'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal. *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011) (citing *State v. Brooks*, 337 N.C. 132, 140-41, 446 S.E.2d 579, 585 (1994); *State v. Baker*, 312 N.C. 34, 37, 320 S.E.2d 670, 673 (1984); and *State v. McCollum*, 334 N.C. 208, 237, 433 S.E.2d 144, 160 (1993), *cert. denied*, 512 U.S. 1254, 114 S. Ct. 2784, 129 L. Ed. 2d 895 (1994), and quoting *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (internal citation omitted) (other citation omitted).

## B. "Second Search" of Defendant

**[1]** In his initial challenge to the denial of his suppression motion, Defendant argues that Detective Tisdale conducted two separate searches of his person, that the "second" search violated his right to be free from unreasonable searches and seizures, and that, since Detective Tisdale found the hard object between his buttocks during this "second" search, the evidence seized on that occasion should be suppressed. We do not find Defendant's argument persuasive.

The Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 20 of the North Carolina Constitution protect citizens from unlawful searches and seizures conducted by State officials. U.S. Const. amend. IV, XIV; N.C. Const. art. 1, § 20. In *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), "the United States Supreme Court recognized the right of a law enforcement officer to detain a person for investigation of a crime without probable cause to arrest him if the officer can point to specific and articulable facts, which with inferences from those facts create a reasonable suspicion that the person has committed a crime. Any investigation that results must be reasonable in light of the surrounding circumstances." *State v. Lovin*, 339 N.C. 695, 703-04, 454 S.E.2d 229, 234 (1995).

In his brief, Defendant concedes that "the totality of the circumstances in the present case, including the presence of an unconcealed weapon and what appeared to be drugs in the front seat," provided ample justification for Detective Tisdale's decision to request that Defendant exit the car and to pat Defendant down for weapons. Defendant argues, however, that "the manner and scope of the search

that was conducted unquestionably went beyond the limited search allowed by *Terry*." In essence, Defendant asserts that Detective Tisdale initially performed a complete pat-down of Defendant's person for the purpose of determining if Defendant had any weapons and then, having ascertained that Defendant was not armed, undertook an entirely new search of Defendant's person for the purpose of discovering unlawful drugs and found the "hard substance" only "after the weapons search had already revealed that [Defendant] was not carrying a weapon."

Although Defendant claims that his characterization of the record is supported by evidence elicited on cross-examination, we conclude that Detective Tisdale's testimony described a single pat-down search conducted in a fluid manner following Defendant's removal from the car:

[PROSECUTOR] Can you describe how you patted the defendant down?

[OFFICER] I patted the defendant down starting from the top to bottom, beginning with the shoulders. I then asked him to place his arms in the air or spread them out, starting with shoulders. I did a search, pat-down of the arms, going underneath the armpit come down to the waistline. After I go down to the waistline, I go all the way down past their knees to the ankles. Then I come in a forward motion between their crotch and buttocks area. I conducted a thorough pat-down moving my hand upward and come down to the next side, to the left side, and go all the way down past their knees and ankles.

[PROSECUTOR] Is that what you did with [Defendant] on this date?

[OFFICER] Yes, sir, I did.

[PROSECUTOR] Did you note anything from your pat-down?

[OFFICER] Yes, sir. During my pat-down and based on the sudden movements that I observed the defendant do, I suspected that he may have been concealing a weapon. During the search of the waist area, I did not feel a weapon. That is when my search began to move to his crotch area. As I placed my hand, flat hand, between his crotch area and his buttocks, I felt a hard-like substance between his buttocks.

Although Detective Tisdale did testify that, "[a]s I am searching him and I am not finding any weapons, that is when I went for the drug

search," Detective Tisdale's testimony, viewed in context, does not support Defendant's assertion that two separate searches occurred.

> [COUNSEL] You then conducted a search of his person for weapons; true?

> [OFFICER] That's correct.

> [COUNSEL] Based on your report, it appears as though you did a second search. This is when you felt something inside [Defendant's] crotch?

> [OFFICER] I am trying to see where I did a second search. It doesn't say a second search. If I can elaborate on it.

> [COUNSEL] Sure. Please.

> [OFFICER] My statement says he was ordered out of the car. Based on that he was handcuffed and he was patted down for weapons, no weapons were located. Based on his movement [inside the car] and my training and experience, I then suspected that he was placing drugs inside his pants. As I am searching him and I am not finding any weapons, that is when I went for the drug search.

The fact that Detective Tisdale was concerned that Defendant possessed either a weapon or drugs and the fact that Detective Tisdale developed certain suspicions based on his training and experience does not transform what was clearly a single, brief, protective search into two separate events. As a result, after carefully reviewing the record, we conclude, consistently with Judge Bridges' findings of fact, that the essence of Detective Tisdale's testimony is that, during the course of a valid pat-down for weapons, he discovered a hard object between Defendant's buttocks. Thus, Defendant's argument in reliance upon this "two search" theory lacks merit.

### C. Probable Cause

[2] Secondly, Defendant argues that Judge Bridges erred by "concluding that probable cause arose" "when [Detective Tisdale] felt something hard between the defendant's buttocks." We disagree.

> The law of probable cause is well established. An officer may make a warrantless arrest of any person the officer has probable cause to believe has committed a criminal offense. See N.C. [Gen. Stat.] § 15A-401(b) [(2011)]. "Probable cause" is defined as "those facts and circumstances within an officer's knowledge . . . which

are sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." The Supreme Court has explained that probable cause "does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability that incriminating evidence is involved is all that is required." A probability of illegal activity, rather than a *prima facie* showing of illegal activity or proof of guilt, is sufficient.

*Biber*, 365 N.C. at 168-69, 712 S.E.2d at 879 (quoting *State v. Williams*, 314 N.C. 337, 343, 333 S.E.2d 708, 713 (1985), and *Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543, 75 L. Ed. 2d 502, 514 (1983), and citing *Illinois v. Gates*, 462 U.S. 213, 235, 103 S. Ct. 2317, 2230, 76 L. Ed. 2d 527, 546 (1983) (other citations omitted).

In its order, the trial court found as a fact that:

7.  . . . Detective Tisdale and Officer Pittman made voluntary contact with three individuals that were seated in a parked vehicle in the parking lot of 3317 Grant Street, Charlotte, NC.

8.  That Detective Tisdale, based on his training and experience, is familiar with this area and knows the area to have high drug and high crime activity.

9.  That at the time voluntary contact was made it was late at night, approximately 12:15 am.

10. That the defendant was seated in the back seat directly behind the driver of the vehicle.

11. That as Detective Tisdale was speaking with the driver of the vehicle, he observed the defendant holding a large amount of money in different denominations and that he observed the money fall onto the floorboard of the vehicle.

12. That Detective Tisdale next observed the defendant make a quick movement by placing his right hand behind his back to his pants.

13. That Officer Pittman notified Detective Tisdale that he observed a machete on the seat between the driver and the front passenger.

14. That for officer safety Officer Pittman asked the front right passenger, Jeffrey Hairston, to exit the vehicle.

15. That at this time Officer Pittman observed what he believed to be crack cocaine in plain view on the seat where Hairston had been seated.

16. That Officer Pittman notified Detective Tisdale of the suspected crack cocaine in plain view.

17. That Detective Tisdale then ordered the defendant to step out of the vehicle and then detained the defendant in handcuffs for officer safety.

18. That Detective Tisdale then conducted a pat down of the defendant for weapons. No weapons were found on the defendant's person.

19. That based on the totality of the circumstances and based on Detective Tisdale's training and experience, he believed the defendant may have been concealing illegal narcotics inside his pants.

20. That Detective Tisdale then conducted a pat down search between the legs of the defendant and felt a hard like substance between the defendant's buttocks.

Based on these and other findings, Judge Bridges concluded that "[t]he Detective had probable cause to believe evidence of criminal activity was located on the defendant's person when he felt something hard between the defendant's buttocks outside of the defendant's clothing." We conclude that Judge Bridges did not err in reaching this conclusion.

At the hearing held with respect to Defendant's suppression motion, Detective Tisdale testified that:

[OFFICER] . . . As I placed my hand, flat hand, between his crotch area and his buttocks, I felt a hard-like substance between his buttocks.

[PROSECUTOR]   Based on your training and experience, what did you expect that might be?

. . . .

[OFFICER]   From my training and experience and in encountering numerous subjects that concealed illegal narcotics in the buttocks area, I immediately placed the defendant in cuffs and escorted him over to my vehicle, to a secure area, so I could conduct a more thorough search.

Thus, Judge Bridges found that Detective Tisdale immediately inferred, based on his training and experience, that Defendant may have been hiding drugs after encountering a hard substance between his buttocks. The fact that "the substance was hidden in the cleft of the defendant's buttocks" was significant, since that is "an unlikely place for carrying a legal substance." *State v. Singleton*, 274 Conn. 426, 441, 876 A.2d 1, 9 (2005). In addition, according to Judge Bridges' findings of fact, Detective Tisdale also knew that: (1) Defendant was sitting in a car parked in a high crime area; (2) a large machete was observed between the front passenger's seat and the driver's seat; (3) the front seat passenger possessed what appeared to be cocaine; (4) when law enforcement officers began speaking with the occupants of the car, Defendant dropped a large sum of cash onto the floor; and, (5) after dropping money on the floor, Defendant immediately made a quick movement behind his back. As a result, given Defendant's "suspicious behavior during the traffic stop and [Detective Tisdale's] subsequent discovery of what he believed to be narcotics in [Defendant's] buttocks," Detective Tisdale had "probable cause to arrest" Defendant. *U.S. v. Davis*, 457 F.3d 817, 823 (8th Cir. 2006), *cert. denied*, 549 U.S. 1258, 127 S. Ct. 1386, 167 L. Ed. 2d 169 (2007) (citations omitted). Thus, Judge Bridges did not err by concluding that Detective Tisdale had probable cause to arrest Defendant, since the circumstances surrounding Detective Tisdale's encounter with Defendant "clearly would warrant a man of reasonable caution in believing that the defendant was in the possession of drugs and was hiding evidence which would incriminate him." *State v. Peck*, 305 N.C. 734, 742, 291 S.E.2d 637, 642 (1982).[1]

## D. "Strip Search"

[3] Finally, Defendant contends that Judge Bridges erred by concluding that the search of Defendant's buttocks "was not a strip search, [and] that exigent circumstances were not required." More specifically, Defendant asserts that Detective Tisdale's search of his person constituted a "strip search," making it necessary for Judge Bridges to find the existence of "exigent circumstances" as a precondition for upholding the challenged search. The State, on the other hand, argues that Detective Tisdale's search of Defendant was "not tantamount to a strip search" and did not, for that reason, "requir[e]

---

1. In light of our determination that Detective Tisdale had probable cause to arrest and search Defendant, we need not address Defendant's argument that the "plain feel" doctrine did not provide an alternative basis for upholding the search of Defendant's person.

additional circumstances of exigency." After carefully examining the reported decisions of this Court and the Supreme Court, we conclude that Judge Bridges did not err by denying Defendant's suppression motion.

"An officer may conduct a warrantless search incident to a lawful arrest. A search is considered incident to arrest even if conducted prior to formal arrest if probable cause to arrest exists prior to the search and the evidence seized is not necessary to establish that probable cause." *State v. Mills*, 104 N.C. App. 724, 728, 411 S.E.2d 193, 195 (1991) (citing *Brinegar v. United States*, 338 U.S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949), *State v. Wooten*, 34 N.C. App. 85, 89, 237 S.E.2d 301, 304-05 (1977), and *State v. Hardy*, 299 N.C. 445, 455, 263 S.E.2d 711, 718 (1980)). " 'The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.' " *State v. Battle*, 202 N.C. App. 376, 383, 688 S.E.2d 805, 812 (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S. Ct. 1801, 1803, 114 L. Ed. 2d 297, 302 (1991)), *disc. review denied*, 364 N.C. 327, 700 S.E.2d 926 (2010). "'What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself. As a result, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *Battle*, 202 N.C. App. at 383, 688 S.E.2d at 812 (quoting *Skinner v. Railway Labor Executives' Ass'n.*, 489 U.S. 602, 619, 109 S. Ct. 1402, 1415, 103 L. Ed. 2d 639, 661 (1989) (internal citations omitted).

> "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."

*Battle*, 202 N.C. App. at 383, 688 S.E.2d at 812 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d 447, 481 (1979)).

"Courts across the country are uniform in their condemnation of intrusive searches performed in public." *Campbell v. Miller*, 499 F.3d 711, 719 (7th Cir. 2007). Thus, "[i]n order for a roadside strip search to pass constitutional muster, there must be both probable cause and exigent circumstances that show some significant government or

public interest would be endangered were the police to wait until they could conduct the search in a more discreet location—usually at a private location within a police facility." *Battle*, 202 N.C. App. at 388, 688 S.E.2d at 815. However, we "note that neither the United States Supreme Court nor the appellate courts of this State have clearly defined the term 'strip search.' " *Battle* at 381, 688 S.E.2d at 811. As the United States Supreme Court recently stated:

> The opinions in earlier proceedings, the briefs on file, and some cases of this Court refer to a "strip search." The term is imprecise. It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.

*Florence v. Bd. of Chosen Freeholders*, ___ U.S. ___, ___, 132 S. Ct. 1510, 1515, 182 L. Ed. 2d 566, 574 (2012). For that reason, there is no precise definition of what a "strip search" actually is. Moreover, the United States Supreme Court has specifically stated that "we would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen." *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, ___, 129 S. Ct. 2633, 2641, 174 L. Ed. 2d 354, 364 (2009). However:

> "[a] valid search incident to arrest . . . will not normally permit a law enforcement officer to conduct a roadside strip search." Rather, "[i]n order for a roadside strip search to pass constitutional muster, there must be both probable cause and exigent circumstances that show some significant government or public interest would be endangered were the police to wait until they could conduct the search in a more discreet location[.]"

*State v. Fowler*, ___ N.C. App. ___, ___, ___ S.E.2d ___, ___ (1 May 2012) (quoting *Battle*, 202 N.C. App. at 387-88, 688 S.E.2d at 815).

In light of these general principles, we note that this Court and the Supreme Court have addressed the lawfulness of searches of a defendant's underwear or his or her anal or genital regions on at least three separate occasions in reported decisions. In the first of these decisions, an investigating officer "received a call from a source he

had used [successfully] two times in the past" to the effect that the defendant, who had $2,000 in his possession and was operating a red Ford Escort, "was going to an unknown location to purchase cocaine" and that, after purchasing the cocaine, the defendant would return to a specific apartment to package the cocaine in aluminum foil before delivering it to a third location, at which the cocaine would be sold. *State v. Smith*, 118 N.C. App. 106, 108, 454 S.E.2d 680, 681-82, *reversed*, 342 N.C. 407, 464 S.E.2d 45 (1995). According to the informant, the defendant " 'would have the cocaine concealed in his crotch, or under his crotch' " at the time that he left the apartment at which he planned to package the cocaine. *Smith*, 118 N.C. App. at 108, 454 S.E.2d at 682. After the defendant left the apartment at which the cocaine was to be packaged, investigating officers stopped the Ford Escort that he was driving, conducted a pat-down of the defendant's person, and then conducted a more thorough search, during which the officer asked the defendant to open his trousers and then pulled down his underwear, resulting in the discovery of a paper towel containing crack cocaine underneath the defendant's scrotum. *Smith*, 118 N.C. App. at 108-09, 454 S.E.2d at 682. Although a majority of this Court held that the "the search of the defendant was intolerable in its intensity and scope and therefore unreasonable under the Fourth Amendment," *Smith*, 118 N.C. App. at 116, 454 S.E.2d at 686, the Supreme Court reversed that decision and upheld the denial of the defendant's suppression motion on the grounds that the officer took adequate steps to avoid exposing the defendant's private areas and that "the availability of . . . less intrusive means does not automatically transform an otherwise unreasonable search into a Fourth Amendment violation." *Smith*, 118 N.C. App. at 118, 454 S.E.2d at 687.

In *Battle*, 202 N.C. App. at 376, 688 S.E.2d at 805,[2] investigating officers received a tip from a reliable informant that a vehicle operated by the defendant's boyfriend and containing the defendant and another passenger would be utilized in connection with the purchase of an ounce to an ounce and a half of cocaine. Based upon this information and the fact that a substance seized from the defendant's boyfriend on a prior occasion had tested positive for cocaine, investigating officers stopped the vehicle driven by the defendant's boyfriend. Although a search of the car revealed the presence of drug

2. Although the decision to reverse the denial of the defendant's suppression motion was a unanimous one, only one of the three members of the panel joined the opinion discussed in the text. In subsequent decisions, however, the opinion discussed in the text has been treated as an opinion by the Court rather than an opinion by a single judge.

**STATE v. ROBINSON**

[221 N.C. App. 266 (2012)]

paraphernalia, no drugs were found on either the defendant's boyfriend or the third occupant of the vehicle. As a result, a female officer took the defendant to a spot between the open doors of a police vehicle, asked her to "pull the bottom of her bra away from her body and shake the bra," and then "conducted a pat-down search of Defendant." *Battle*, 202 N.C. App. at 379, 688 S.E.2d at 809-10. After feeling "nothing that suggested [that the defendant] was carrying a weapon or contraband pursuant to this search," the officer pulled the defendant's pants open while a male colleague stood nearby with a Taser, pulled the defendant's underwear back, and discovered a five dollar bill, a crack pipe, and a plastic baggie containing a tan powder beneath the defendant's underwear. *Battle*, 202 N.C. App. at 379, 688 S.E.2d at 810. On appeal, this Court reversed the trial court's denial of the defendant's suppression motion on the grounds that the defendant "was strip searched on the side of a street in broad daylight" and that the "State presented *no* evidence of exigent circumstances" justifying that action. *Battle*, 202 N.C. App. at 393, 396, 688 S.E.2d at 818, 820. The Court distinguished *Smith* on the grounds that "the confidential informant specifically stated that the *defendant* would be hiding the cocaine *in the defendant's underpants*, and perhaps underneath the defendant's scrotum;" that the officer had "multiple sources indicating that the defendant was a serious drug dealer" and "operated out of multiple locations;" and that "[t]he search took place in the early morning hours" without any indication "that there were other people in the immediate vicinity other than the officers." *Battle*, 202 N.C. App. at 401, 688 S.E.2d at 823 (emphasis in the original).

Recently, in *Fowler*, ___ N.C. App. at ___, ___ S.E.2d at ___, the record tended to show that an officer had received information that the defendant planned to meet an informant to complete a drug transaction. After the informant failed to appear at the specified location, the defendant drove away. Subsequently, the officer stopped the defendant's vehicle for speeding, ascertained that the defendant's license had been permanently suspended, and placed him under arrest. Upon locating a small quantity of marijuana in the defendant's vehicle, the officer decided to search the defendant's person for the presence of drugs. After failing to locate any contraband in the defendant's pockets and waistband area, the officer "undid defendant's belt and looked down into defendant's pants while asking defendant to sway back and forth in an attempt to 'loosen up anything that may have been hidden on his person." *Fowler*, ___ N.C. App at ___, ___ S.E.2d at ___. Upon failing to find any contraband, the officer drove the defendant to a secluded spot, where he "dropped defendant's

pants down and searched defendant's pants down and searched defendant's boxer briefs with his hand," ultimately "discover[ing] an object containing three grams of crack cocaine in the 'kangaroo pouch' of defendant's boxer briefs, or the 'fly area . . . where the two pieces of fabric overlap. *Fowler*, ___ N.C. App. at ___, ___ S.E.2d at ___. On appeal, this Court held that "the search[] of defendant's person constituted [a] strip search," noting that, "[d]uring [the] search[], defendant's private areas were observed by [the law enforcement officer]." *Fowler*, ___ N.C. App. at ___, ___ S.E.2d ___. However, we also held that there was ample reason to believe that the defendant would be carrying drugs, that the second "strip search" took place at a "discreet" location, and that exigent circumstances (consisting of the defendant's familiarity with processing procedures at the jail and his repeated requests not to be taken there) justified a strip search of the defendant. *Fowler*, ___ N.C. App. at ___, ___ S.E.2d at ___.

As should be obvious, the search at issue in *Fowler* was upheld on the basis that the record showed the existence of exigent circumstances justifying an immediate examination of the defendant's underwear and his anal and genital areas. In *Battle*, on the other hand, a similar search of the area beneath the defendant's underwear was invalidated given the absence of exigent circumstances of the type present in *Fowler*. *Smith*, on the other hand, upheld a search underneath the defendant's underwear despite the absence of any exigent circumstances of the sort found in *Fowler*. According to well-established principles of North Carolina law, we are bound by each of these decisions. *Cannon v. Miller*, 313 N.C. 324, 327 S.E.2d 888 (1985) (holding that the Court of Appeals lacks the authority to overrule decisions of the Supreme Court of North Carolina and has a "responsibility to follow those decisions, until otherwise ordered by the Supreme Court"); *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) (holding that "a panel of the Court of Appeals is bound by a prior decision of another panel of the same court addressing the same question, but in a different case, unless overturned by an intervening decision from a higher court"). A helpful manner in which to give content to each of these decisions without impermissibly rendering any of them a nullity is suggested by the fact that the Court in *Battle* distinguished *Smith*, in large part, on the grounds that the record was devoid of any indication that the defendant might be concealing weapons or contraband in her underclothing.[3] As a result, we

---

3. Our dissenting colleague argues that the form of analysis adopted in *Battle* is identical to that employed by both the majority opinion and the dissent (which was ultimately adopted by the Supreme Court) in *Smith*. However, neither the excerpt from

conclude that the mode of analysis outlined in *Battle* and adopted in *Fowler*[4] only applies in the event that the investigating officers lack a specific basis for believing that a weapon or contraband is present beneath the defendant's underclothing. Unless we adopt such an understanding of the relevant cases, we will have effectively over-ruled *Smith*, an action that we lack the authority to take.[5]

The undisputed evidence in the present record, as reflected in Judge Bridges' findings, indicates that various items of drug-related evidence were observed in the vehicle in which Defendant was riding, that Defendant made furtive movements towards his pants, and that Detective Tisdale felt a hard object between Defendant's buttocks. For that reason, it is clear that Detective Tisdale had ample basis for believing that contraband would be discovered beneath Defendant's underclothing. In addition, Judge Bridges' unchallenged findings of fact establish that Detective Tisdale took certain steps to protect Defendant's privacy. More specifically, Judge Bridges found as a fact:

21. That Detective Tisdale then escorted the defendant over to his patrol vehicle to complete the search.

22. That during the search the lights of the patrol vehicle were not turned on.

23. That during the search there were no other individuals in the immediate area.

---

the *Smith* majority opinion nor the excerpt from the *Smith* dissent quoted in the dissent in this case make any reference, as the dissent seems to suggest, to any issue relating to the lawfulness of a "strip search." Instead, the words "warrantless search" appear where the dissent inserts the words "strip search" in both of the quotations from *Smith* upon which the dissent relies. The appropriateness of the officer's decision to conduct a warrantless search of the defendant in *Smith* and the appropriateness of the manner in which the defendant in *Smith* was searched were two separate and distinct issues. Simply put, there is no discussion of the necessity for a showing that "exigent circumstances" exist in the discussion of the defendant's challenge to the manner in which he was searched in either the majority or dissenting opinion in *Smith*, a fact which we believe undermines our dissenting colleague's challenge to the result we have reached in this case.

4. *Fowler* was devoid of any specific basis for believing that contraband would be located underneath the defendant's underclothing or in the defendant's genital or anal area.

5. For this reason, we disagree with our dissenting colleague's argument that we have erred by failing to determine whether a "strip search" did or did not occur in this instance.

24. That during the search Detective Tisdale shielded the defend-ant from public viewing by opening the rear door of the patrol vehicle and by standing directly behind the defendant.

25. That during the search Detective Tisdale did not undo any buttons or zippers on the defendant's pants, nor did he put his hands or his flashlight down the defendant's pants.

26. That the defendant was wearing bagg[y] clothes and Detective Tisdale pulled back the pants of the defendant but did not pull his pants down.

27. That Detective Tisdale instructed the defendant to bend for-ward at the waist and then shined his flashlight inside the defendant's pants from behind and observed a clear plastic baggie between the defendant's buttocks.

28. That Detective Tisdale asked the defendant to separate his buttocks and after doing so the plastic baggie feel out.

29. That Detective Tisdale then collected the baggie and believed it to contain crack cocaine.

30. That Detective Tisdale's flashlight was the only source of illumi-nation in the immediate vicinity of the search of the defendant.

As a result, given that Detective Tisdale had ample basis for believing that Defendant had contraband beneath his underwear and given that Detective Tisdale took reasonable steps to protect Defendant's pri-vacy, we conclude that this case is controlled by *Smith*, necessitating the conclusion that any failure on Judge Bridges' part to utilize the method of analysis outlined in *Battle* in reaching his decision was irrelevant. In view of the fact that Defendant's only challenge to the scope of the search of his person conducted by Detective Tisdale assumed the applicability of the approach adopted in *Battle* and in view of the fact that *Battle* is not controlling in this case, we neces-sarily determine that Defendant's final challenge to Judge Bridges' order lacks merit.

### III. Conclusion

Thus, for the reasons discussed above, we conclude that Judge Bridges did not err by denying Defendant's suppression motion. As a result, the trial court's judgment should, and hereby does, remain undisturbed.

**STATE v. ROBINSON**

[221 N.C. App. 266 (2012)]

NO ERROR.

Judge BRYANT concurs.

Judge ELMORE dissents by separate opinion.

ELMORE, Judge dissenting.

I respectfully disagree with the holding of the majority that this Court's ruling in *Battle* is not controlling in the present case. Accordingly, I believe that the trial court erred in denying defendant's motion to suppress the evidence obtained as a result of the roadside "strip search."

Defendant presented two arguments on appeal with regards to this issue: 1) that the search of his person constituted a "strip search" and 2) that it was necessary for the trial court to find the existence of "exigent circumstances" as a precondition for upholding the challenged search. I agree with defendant on both points, and I will address each argument in turn.

Regarding defendant's first argument, I feel as though the majority has failed to properly address whether the search of defendant constituted a "strip search." The majority simply concludes that "there is no precise definition of what a 'strip search' actually is" and then proceeds to address defendant's second argument. While it is true that our Courts have never precisely defined the term "strip search," there is nevertheless sufficient authority to properly classify the search at issue here as a "strip search."

Our Supreme Court has held that "people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or *to have their private parts observed or touched by others.*" *State v. Stone*, 362 N.C. 50, 55, 653 S.E.2d 414, 418 (2007) (emphasis added). In *Smith* we found the search of defendant to be "akin to a strip search." 118 N.C. App. at 116, 454 S.E.2d at 686. There, the officer pulled the defendant's pants down far enough that he could see a small corner of paper towel under defendant's scrotum. Likewise, in *Fowler* we concluded that "the searches of [the] defendant's person constituted strip searches" because "[the] defendant's private areas were observed by [the officer]." ___ N.C. App. at ___, ___ S.E.2d at ___. Here, defendant was instructed to bend forward at the waist, to pull the back of his pants outward six inches, and to spread his buttocks apart. Detective Tisdale then inspected the area

near defendant's buttocks. Thus, I believe that the search of defendant here is properly classified as a "strip search."

Defendant's second argument is that that it was necessary for the trial court to find the existence of "exigent circumstances" as a precondition for upholding the challenged search. Again, I agree with defendant.

In *Battle* we noted that "[s]trip searches . . . are not a matter of course for searches incident either to arrest or detention" and that "[p]ublic intrusive searches of the body should never be commonplace but reserved for only the most unusual cases." 202 N.C. App. 376, 403, 688 S.E.2d 805, 824 (2010) (quotations and citations omitted). We then very clearly held that "[f]or a [strip] search to comply with the requirements of Fourth Amendment jurisprudence, there must be sufficient supporting facts and *exigent circumstances* prior to initiating a strip search to justify this heightened intrusion into a suspect's right to privacy." *Id.* at 392, 688 S.E.2d at 817 (emphasis added).

Here, the finding of facts section of the trial court's order denying defendant's motion to suppress makes no mention of exigent circumstances as required by *Battle*. As such, I believe that the trial court erred in denying defendant's motion to suppress.

The majority concludes that *Battle* is not controlling in the present case because the analysis outlined in *Battle* contradicts the analysis outlined in *Smith*. By this logic, the majority determined that the only way to give content to both decisions without impermissibly rendering either of them a nullity is to conclude that *Battle* "only applies in the event that the investigating officers lack a specific basis for believing that a weapon or contraband is present beneath the defendant's clothing." I disagree with this conclusion, and I find that the majority has misapplied the precedent established by *Smith*.

In *Smith*, this Court held that if "probable cause to search exists and *the exigencies* of the situation make [the] search necessary, it is lawful to conduct" a "strip search." 118 N.C. App. at 111, 454 S.E.2d at 684 (citation omitted) (emphasis added). But we then reversed the trial court's denial of the defendant's suppression motion because we concluded that "the search of defendant was intolerable in its intensity and scope and therefore unreasonable under the Fourth Amendment." 118 N.C. App. 106, 116, 454 S.E.2d 680, 686. Our Supreme Court then reversed our decision in that case "for the rea-

sons stated in the dissenting opinion." *State v. Smith*, 342 N.C. 407, 464 S.E.2d 45 (1995). The reasons were that "the availability of those less intrusive means does not automatically transform an otherwise reasonable search into a Fourth Amendment violation." *Smith*, 118 N.C. App. at 118, 454 S.E.2d at 687. However, even in that dissent, Judge Walker affirmed that "probable cause and an exigency for [the] search" must exist for the strip search to be valid. *Smith*, 118 N.C. App. at 116, 454 S.E.2d at 687.

Thus, I believe that this Court has clearly articulated in both *Battle* and *Smith* that for a roadside "strip search" to be valid the officer must have 1) probable cause and 2) exigent circumstances to conduct the search. Since the trial court here failed to make the necessary findings regarding exigent circumstances, I would reverse the trial court's order denying defendant's suppression motion.